Gregory Bryan STAHL, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–85–0470–CR.

Court of Appeals of Texas, Houston (1st Dist.).

May 15, 1986.

Rehearing Denied June 12, 1986.

Allen C. Isbell, Houston, for appellant.

John B. Holmes, Jr., Harris County Dist. Atty., Timothy G. Taft, Lee Coffee, Harris County Asst. Dist. Attys., Houston, for appellee.

Before SAM BASS, HOYT and DUNN, JJ.

OPINION

SAM BASS, Justice.

A jury convicted appellant of murder and assessed punishment at seven years confinement.

We reverse and remand.

Gregory Leonard testified that he lived with appellant for two months prior to the shooting. Approximately one month prior to the homicide, Arthur Newton, the deceased, moved into appellant's apartment. He was to pay one-half of the rent and living expenses, but never did. During the time the deceased lived with appellant and Leonard, he "conned" appellant out of more than $600.00. The first time, the deceased told appellant he could turn a quick profit if he had $350.00 or $400.00 to purchase some gold coins. Appellant gave him the money, but the deceased used the money "for his own purposes." The second time, the deceased persuaded appellant into "hocking" his tools on the promise that he would pay the rent but, again, the deceased kept the money and never paid appellant.

This situation evoked a stormy relationship that broke out into arguments over money. Leonard testified that he heard appellant "threaten to kill" the deceased four or five times unless he was repaid, but admitted that appellant never used the word "kill."

Anthony Demidio testified that appellant made a similar threat on the day preceding the homicide.

Leonard further testified that the only time he saw the deceased show violence towards appellant was when appellant returned to the apartment one night, retrieved a pistol, pointed it at Leonard, and pulled the trigger. The bullet struck on the wall. The deceased, who had been watching television, got up, took the gun away from appellant, and hit him open-handedly.

Leonard also testified that both he and appellant had taken steps to be drug enforcement informants, and that he had related to appellant that the deceased, a

heavy drug user, suspected that appellant was a "narc" or informant.

Leonard admitted that a written statement he gave the police in which he claimed he was an eyewitness to the shooting was a lie.

Rudy Validez testified that he was a mutual friend of the deceased and of appellant and was with them just moments prior to the homicide, although he was not an eyewitness to the shooting itself.

Validez and appellant went to a nightclub and returned to appellant's apartment at approximately 2:10 a.m. on August 8, 1984. Appellant had been drinking at the club and was "drunk." The deceased was at the apartment. The deceased and appellant began arguing over rent and about a police officer's card on the door. The argument lasted for about 30 minutes. The deceased accused appellant of being a "narc." Validez stopped the argument, suggesting that the three of them go to his apartment for a beer.

When they arrived at Validez's apartment, appellant resumed the argument, but then left. He returned five minutes later and sat next to the deceased. When appellant leaned over, the deceased grabbed a gun from appellant's pants, slapped appellant with the gun cutting his cheek and earlobe, and separated the clip from the gun. Appellant, temporarily stunned, challenged the deceased to go outside and fight, but the deceased refused. Eventually, Validez told them to leave.

Validez watched them leave. Appellant left with the gun and the deceased with the clip to the gun. Appellant walked towards his apartment; the deceased first walked towards the parking lot with his dog and then to his apartment. When the deceased was walking back to his apartment, Validez heard a single gunshot. Immediately, appellant ran to Validez's apartment and knocked on his door, but Validez did not open the door.

Validez testified that appellant told him the deceased died instantly.

Lieutenant Leo Horn, of the Harris County Sheriff's Department (HCSD), stated that on August 8, 1984, at approximately 3:30 a.m., a pickup truck approached his patrol car at a service station. A man exited, later identified by Horn as appellant, approached Horn, and asked him for help. Appellant was excited, distraught, and nervous. Horn noticed blood on appellant's right cheek. Appellant stated he had been jumped by someone and that he (appellant) was a cripple. Horn asked where the assailant was, and appellant said he was dead. Horn then asked appellant how he knew the man was dead, and appellant replied that he had shot the man and that the man lay on his front porch. Appellant also stated that he was a sharpshooter and did not miss, and pointed to medals in his truck awarded for sharpshooting. Horn admitted that at first he was doubtful of appellant's story, and that by emphasizing his sharpshooting skills, appellant could have been trying to convince Horn to believe him.

Horn retrieved a Rueger semi-automatic pistol from appellant's truck; the pistol had the magazine in it. Horn then followed appellant to his apartment complex where Horn saw the deceased lying on his back on the concrete entrance area of appellant's apartment. At this point, Horn arrested appellant.

Chief R.L. Parsley of the Jersey Village Police Department testified he was a resident at appellant's apartment complex. He had left his business card on appellant's apartment door approximately one week before the incident. Parsley also testified about a conversation he had with appellant after the shooting and prior to appellant's arrest and construed appellant's attitude as being proud of what he had done.

Deputy R.C. Stampp of the HCSD testified that he was called to the crime scene and the deceased's body was lying face up with a gunshot wound to the right side of the head. Stampp noticed a slight trail of blood from the apartment to where the body lay. The deceased's head was approximately 8 feet from the apartment.

Sergeant James M. Watson of the HCSD testified that the clip of the pistol contained seven live shells. One spent cartridge was found just inside the apartment doorway. No tests had been conducted to determine the trajectory distance of a shell from that pistol. Watson attempted to lift fingerprints off of the pistol and its clip, but was unsuccessful.

Aurelio Espinola, Deputy Chief Medical Examiner for Harris County, testified that in his opinion the cause of death was a gunshot wound at the back of the head. The injuries sustained would have been consistent with that produced by a .22 caliber pistol fired within a range of approximately 8 feet. The path of the bullet went from behind the ear towards the front.

Appellant testified that the deceased began living with him before the homicide, and that the deceased was a heavy drug user and owed him money. He knew that the deceased was on probation for robbery. The deceased had struck him once before.

Appellant had argued with the deceased over money and also about accusations by the deceased that appellant was a "narc." These accusations began about one week prior to the shooting. In particular, an argument had resulted from the discovery of Parsley's card on appellant's apartment door.

Appellant confirmed that on the night of the incident, he went to a nightclub with Validez and had been drinking, but denied being drunk. Appellant and Validez had been discussing the deceased's accusations against appellant.

They first returned to Validez's apartment. Appellant then left to check on his apartment and found it wide open, which indicated to him that the deceased had been there. Alarmed because of the deceased's violent nature, appellant retrieved his pistol and placed it behind his pants.

Appellant returned to Validez's apartment and the deceased was there. The deceased began accusing appellant of being a "narc", and they began to argue. The deceased then grabbed appellant's gun and slapped him with it, ripping his face. Appellant was stunned and demanded the deceased fight "man-to-man."

The deceased removed the clip of the gun, handed the pistol back to appellant, and kept the clip. Appellant then went to his apartment, doctored his face, put the pistol on the coffee table, took off his prothesis and pants, and lay on the couch. Appellant wears a prothesis, having lost a leg in an automobile accident.

The deceased returned, seized the pistol, inserted the clip, pointed the pistol at appellant, and demanded he come with him. At this point, appellant testified he was in fear of his life.

Appellant lunged at the deceased, and they hit the ground in the doorway area. Appellant got up and as the deceased began to get up, he appeared to be lunging at appellant and yelled "If I don't kill you, my cousin will." Simultaneously, appellant reached up, pointed the pistol, and shot the deceased. Appellant then put on his prothesis and ran to Validez's place for help. He then drove to a service station where he asked Horn for help. Because Horn did not appear to believe him, he emphasized his sharpshooting skills.

Appellant testified that he was "scared" the entire time. He said he was "upset" at the deceased for slapping him with the pistol, but denied that he shot the deceased in retaliation for that injury. He denied that he intentionally shot the deceased in the head. Appellant confirmed that the deceased was unarmed when he shot him, and denied making statements to the effect that he was proud of the incident.

Detective Anthony Rossie of the HCSD testified that he took appellant's confession the morning after the incident, and that appellant appeared both upset and boastful.

In his first two grounds of error, appellant alleges that the trial court erred in refusing to charge the jury on voluntary manslaughter, and that the State had to prove beyond a reasonable doubt that the

homicide did not occur because of sudden passion arising from an adequate cause.

Appellant argues that because the record shows an agitated and excited mind at the time of the killing caused by the acts of the deceased, as well as anger caused by the deceased by the pistol-whipping prior to the shooting, that the issue of sudden passion is raised.

Tex.Penal Code Ann. § 19.04 (Vernon 1974) provides in pertinent part that:

(a) A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

(b) "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.

(c) "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

■ Voluntary manslaughter differs from murder in that the actions causing the death occur under the immediate influence of sudden passion arising from an adequate cause. *Stevens v. State*, 671 S.W.2d 517, 523 (Tex.Crim.App.1984).

■ Unless there is some evidence of sudden passion in the case, voluntary manslaughter cannot be considered a lesser included offense of murder. *Bradley v. State*, 688 S.W.2d 847, 851 (Tex.Crim.App. 1985).

■ When evidence *from any source* raises a defensive issue or raises an issue that a lesser included offense may have been committed, and a jury charge on the issue is properly requested, the issue must be submitted to the jury. *Moore v. State*,

574 S.W.2d 122, 124 (Tex.Crim.App.1978) (emphasis added).

■ An objecting accused is not automatically entitled to a charge on voluntary manslaughter even when the evidence raises the issue, and the court charges on the law of self-defense (as it did in this cause), unless there is evidence that the killing occurred under the immediate influence of sudden passion arising from an adequate cause. *Bradley v. State*, 688 S.W.2d at 847; *Daniels v. State*, 645 S.W.2d 459, 460 (Tex.Crim.App.1983). Further, *if voluntary manslaughter is raised by the evidence*, then the trial court must instruct the jury, in the charge on murder, that in order to convict the defendant of murder, the jury must find beyond a reasonable doubt, the absence of sudden passion. *Cobarrubio v. State*, 675 S.W.2d 749, 751 (Tex.Crim.App.1983) (emphasis added).

■ Appellant's testimony and the evidence at trial, at most, raised the issue of self-defense. But testimony raising the issue of self-defense does not necessarily raise the issue of voluntary manslaughter. *Luck v. State*, 588 S.W.2d 371, 374–375 (Tex.Crim.App.1979). There was no testimony from any source to indicate appellant became enraged, resentful, or terrified immediately prior to the shooting. *Bradley v. State*, 688 S.W.2d at 852. Appellant testified that he was in fear of the deceased. However, a "bare claim" of fear does not demonstrate sudden passion; fear that demonstrates sudden passion must be that which commonly produces a degree of terror "sufficient to render the mind incapable of cool reflection." *Daniels v. State*, 645 S.W.2d at 460; Tex.Penal Code Ann. § 19.04(c) (Vernon 1974). Prior provocation or anger is not alone sufficient to raise the issue of voluntary manslaughter; sudden passion must be directly caused by provocation by the deceased *at the time of the offense. Hobson v. State*, 644 S.W.2d 473, 478 (Tex.Crim.App.1983) (emphasis added).

■ Contrary to appellant's contention, appellant's anger from the pistol whipping

incident is irrelevant to the determination of sudden passion because it was too far removed from the time of the offense.

Appellant testified that at the moment of the shooting, he was scared and in fear of his life, and that the deceased was unarmed. The evidence shows that the deceased was shot in the back of the head. Appellant's fear was not shown to be the result of sudden passion.

The trial court did not err in refusing appellant's requested charge on voluntary manslaughter.

Appellant's first and second grounds of error are overruled.

Appellant argues in his third ground of error that the conviction should be reversed because the evidence is insufficient to negate the issue of voluntary manslaughter, and that the trial court erred in refusing to instruct the jury that they could consider the issue of sudden passion in mitigation of the punishment to be assessed.

Both arguments presuppose that the issue of sudden passion arising from an adequate cause was raised in this case. We have held otherwise.

Accordingly, appellant's third and fourth grounds of error are overruled.

Appellant's seventh ground argues that the trial court committed error in refusing appellant's request to see the entire offense report that Detective A.H. Wollery allegedly used and exhibited before the jury during his direct examination by the State.

On cross-examination, Wollery testified that he had held the 18–page report in issue while testifying before the jury. However, he maintained that he had only used a two-page supplement to that report to refresh his memory. He further testified that his testimony was purely based on personal knowledge.

Defense counsel was given a copy of the supplemental report upon request, but his request for the 18–page document was denied.

The "use before the jury" rule entitles the defendant to inspect, upon timely request, any document, instrument, or statement that has been used by the State before the jury in such a way that its contents become an issue. *Hoffpauir v. State*, 596 S.W.2d 139, 141 (Tex.Crim.App. 1980). The trial court's failure to permit or compel such inspection is reversible error, and a showing of harm resulting from the error is unnecessary. *White v. State*, 478 S.W.2d 506, 511–512 (Tex.Crim.App.1972).

The definition of "use before the jury" includes showing a document to a witness who is on the stand, permitting a witness to identify a document, or reading portions of a document aloud to a jury. *Mendoza v. State*, 552 S.W.2d 444, 448 (Tex.Crim.App.1977). The rule is not applicable unless certain conditions are met. First, the rule comes into play only through the State's use of the document or statement at trial. Second, there must be use of the instrument or statement before the jury in such a way that its contents become an issue. *Id.* It follows that counsel for the State must in some way inform the witness that the document or statement is being referred to during the examination. *Rose v. State*, 427 S.W.2d 609, 611 (Tex. Crim.App.1968).

In the instant case, "the use before the jury rule" is inapplicable because the State did not direct the witness' attention to the document, nor was any indication made to the jury that the document was being used as the basis for the examination. *Mendoza v. State*, 552 S.W.2d at 448; *Jones v. State*, 493 S.W.2d 933, 936–937 (Tex.Crim.App.1973).

Appellant's seventh ground of error is overruled.

Appellant claims in his fifth ground of error that the conviction should be reversed because of prosecutorial misconduct that deprived appellant of a fair trial, namely by allegedly orchestrating the trial to insure that the State's witness, Sandra Newton, would make a highly prejudicial outburst before the jury when identifying an autop-

sy photograph of her son, and in his sixth ground that the trial court erred in denying his motion for a mistrial after this outburst.

Appellant's eighth and ninth grounds allege that the conviction should be reversed because the prosecutor improperly appealed to the expectations of the deceased's mother and family during his arguments at the guilt and punishment stages of trial.

The record reflects that appellant's trial counsel repeatedly offered to stipulate to the identity of the deceased as Arthur Newton to prevent the possibility of an hysterical outburst by the deceased's mother.

The first offer was made at the beginning of the trial when the State asked if Mrs. Newton could remain in the courtroom during the trial. The second offer came when the prosecutor offered State's Exhibit No. 25, an autopsy picture:

MR. ISBELL (Defense Counsel): Our objection to No. 25, Your Honor, is that it doesn't show the wound. Again, we state to the Court that we are not contesting the identity of the deceased and the only purpose that I can see in the strategy of the State is to introduce that photograph and then have the mother come and have to look at that photograph to identify that person as her son.

We think that that is unnecessary in this trial, unnecessary to put the family through that.

We don't want to do that. We will stipulate to the identity and that's the only purpose I can see for the photograph. And we would object.

The prosecutor responded:

MR. COFFEE: ... We respectfully decline that stipulation and we have a right, Mrs. Newton has a right to identify her son in front of this jury.

Defense counsel again requested that the defendant be allowed to stipulate to the identity of the deceased. The trial court called Mrs. Newton when the prosecutor replied that the State had the right to decline the offered stipulation. The following colloquy then occurred:

(Mrs. Newton is brought into courtroom)

THE COURT: Mrs. Newton, in a little while or maybe tomorrow, you will be invited to come in the courtroom so you may identify a picture of what's supposed to be Arthur Newton.

Now, if that happens, ma'am, it will be in the presence of the Jury. I am sure that it will be a very painful experience for you. Nobody wants to put you through that experience.

But I cannot have any emotion shown in front of the jury when you do that. Now, if you can come and identify the picture as painful as it is for you to do without any emotion, then I will allow this to happen. If you can't do it without any emotion, without any crying or anything, then I cannot allow it. And I will have to proceed in a different manner. Can you assure me that if you come in here to identify your son's picture, that you can do it without any emotion?

MRS. NEWTON: I can assure you I will try. I don't—

THE COURT: I know. I understand.

MRS. NEWTON: I can't say what's going to happen.

The trial court overruled defense counsel's objection to Exhibit No. 25 and stated that the State would "be allowed to use whomever they deem necessary and property (sic) to identify the deceased." Exhibit No. 25 was then admitted into evidence.

The State was placed on notice at this point that Mrs. Newton should not be called as a witness in front of the jury unless she could identify Exhibit No. 25 without becoming unduly emotional. After Mrs. Newton was sworn, the following exchange transpired:

MR. ISBELL: Your Honor. We again renew our objection. We are not contesting the identity of the deceased, Arthur Newton, and we think it is unreasonable to put this mother through the task of identifying her son.

We stipulate that that is her son and his name is Arthur Newton who was killed.

MR. COFFEE: Judge, again, for the purpose of the record, the State will respectfully decline that previous stipulation. The Jury has the right to know the identity of the deceased.

THE COURT: Go ahead, please.

\* \* \* \* \* \*

THE COURT: ... Mrs. Newton, if you will remember the remarks I made to you earlier—

THE WITNESS: Yes, sir.

THE COURT: —all right. Those remarks will apply now. Go ahead.

Q. Mrs. Newton, I am going to show you State's Exhibit No. 25, and I want you to take a look at State's Exhibit No. 25 and ask you if you can identify the person depicted in State's Exhibit No. 25?

A. Oh, my God.

Q. Can you identify that picture, Mrs. Newton?

A. Oh, my God. My baby. My God.

MR. ISBELL: Can we have the members of the Jury go to the Jury room?

THE WITNESS: *May he rest in hell. May he burn in hell. Oh, my baby.* (Whereupon the jury leaves the courtroom).

THE WITNESS: Oh, my God.

Appellant's counsel moved for a mistrial, claiming the prosecutor had "orchestrated" the outburst. The prosecutor claimed that Mrs. Newton refused to allow the defense to stipulate to the identity of the deceased because she wanted to see his picture *that she had never seen.*

When the jury was ushered back into the courtroom, appellant's counsel requested an instruction. The trial court instructed the jury "under the strongest terms" not to let the outburst interfere with their verdict. Appellant's subsequent motion for mistrial was denied.

A bystander's bill was perfected to demonstrate that the outburst by the mother was loud and that her words were directed at the defense table. The bill shows that when the jury was ushered out of the courtroom after her emotional outburst, the witness was slumped in the witness chair sobbing. The bill also shows that the witness chair is eight feet from the first juror's chair, and that the entire jury had to pass within four feet of the witness as they were being ushered out during this inflammatory outburst.

Mrs. Newton did not identify Exhibit No. 25. The following day the State called a friend of the deceased, Hillary Thomas, who identified the photograph as depicting the deceased.

During argument at the guilt stage of the trial, the prosecutor injected the expectations of the deceased's mother:

MR. COFFEE: ... You have an opportunity to tell them that we don't like them causing grief to good people like Sandra Newton. You have an opportunity to let Mrs. Newton know that her son did not die in vain.

MR. ISBELL: Your Honor, I am going to object strenuously to the argument of the expectations of Mrs. Newton having anything to do with the guilt or innocence of this Defendant.

THE COURT: All right. Sustained.

MR. ISBELL: Ask the Jury be instructed not to consider that argument whatever.

THE COURT: Members of the Jury, you will arrive at your verdict on this case on the facts you heard in the case, the testimony and the law as I gave it to you in the Charge.

Go ahead.

MR. ISBELL: Your Honor, due to that unfortunate outburst we had earlier in this trial, we ask for a mistrial at this time based upon that argument and that event.

THE COURT: All right. Overruled.

The prosecutor resumed this appeal during argument at the punishment stage:

MR. COFFEE: ... If you want to make certain that justice is done, tell Mrs. Newton and her family that you believe that Arthur's death—

MR. ISBELL: Excuse me, Your Honor. I object to his reference to the mother of the deceased in this Jury argument.

THE COURT: All right. Sustained.

MR. COFFEE: Tell the family of the deceased—

MR. ISBELL: Your Honor, I object to his reference of the family of the deceased in this Jury argument.

THE COURT: Okay. Overruled. Go ahead.

MR. COFFEE: —that Arthur Newton did not die in vain.

Let them know that he did not see his last hours on the streets here in Harris County, Texas. Let them know that even as he lay in the morgue with his eyes open and still fixed, that the last person that he saw, this Defendant, was not the last image he will have to carry with him forever.

Although we have not found cases on point involving witnesses, we hold that the standard applicable to conduct from bystanders during trial equally applies in this case.

■ Conduct from bystanders that interferes with the normal proceedings of a trial will not result in reversible error unless the defendant shows a reasonable probability that the conduct interfered with the jury's verdict. Injury to a defendant is measured on a case-by-case basis. *Landry v. State*, 706 S.W.2d 105, 112 (Tex.Crim. App.1985); *Williams v. State*, 651 S.W.2d 820, 822 (Tex.App.—Houston [1st Dist.] 1983, pet. ref'd).

The purpose of closing argument is to facilitate the jury in properly analyzing the evidence presented at trial so that it may arrive at a just and reasonable conclusion based on the evidence alone and not on any fact not admitted into evidence. *Campbell v. State*, 610 S.W.2d 754, 756 (Tex.Crim. App.1980).

■ To be permissible, jury argument must fall within one of the following four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; (4) plea for law enforcement. *Darden v. State*, 629 S.W.2d 46, 52 (Tex. Crim.App.1982); *Alejandro v. State*, 493 S.W.2d 230, 231–32 (Tex.Crim.App.1973).

■ When an argument exceeds the permissible bounds of the above areas, such will not constitute reversible error unless, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding. *Mathews v. State*, 635 S.W.2d 532, 539 (Tex.Crim.App. 1982); *Todd v. State*, 598 S.W.2d 286, 296– 297 (Tex.Crim.App.1980).

Ordinarily, any injury from an improper jury argument by a prosecutor is obviated when an objection thereto is sustained and the jury is instructed to disregard the argument. *Hodge v. State*, 631 S.W.2d 754, 759 (Tex.Crim.App.1982). The test for determining improper jury argument is whether the remarks made were so inflammatory that their prejudicial effect cannot reasonably be removed by an instruction by the trial court to disregard the statements made. *Id.*

■ In the instant case, the bystander's bill shows how the outburst in reasonable probability interfered with the jury's verdict. That the prosecutor refused to stipulate with the defense as to the identity of the deceased by virtue of the deceased's mother's insistence is not alone suspect, but ensuing events reveal that the prosecutor's motives in putting Sandra Newton on the stand were improper. It is the duty of the State to control the flow of the case, and it should not be left to the whim or desire of a relative of the victim. Further, the prosecutor chose to circumvent the court's instruction to disregard Newton's outburst by repeatedly alluding to her in his closing arguments.

We hold that this conduct compounded the harm created by the outburst and served no purpose other than to inflame and prejudice the minds of the jurors. *Boyde v. State*, 513 S.W.2d 588, 593 (Tex.

Crim.App.1974); *Stein v. State*, 492 S.W.2d 548, 551–552 (Tex.Crim.App.1973).

Under the circumstances, the court's instructions to disregard the outburst and arguments of the prosecutor were insufficient to cure the error presented, and the trial court erred in overruling appellant's motion for a mistrial.

Appellant's remaining grounds of error are sustained.

The judgment is reversed and the cause remanded.