**Gregory Bryan STAHL, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 780–86.**

Court of Criminal Appeals of Texas, En Banc.

March 9, 1988.

Rehearing Denied April 20, 1988.

Allen C. Isbell, on appeal only, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Timothy G. Taft and Lee Coffee, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

OPINION ON APPELLANT'S MOTION FOR REHEARING

CAMPBELL, Judge.

Our prior opinion in this case is withdrawn. Appellant was convicted, after a jury trial, of murder. V.T.C.A. Penal Code, § 19.02. Punishment was assessed by the jury at 7 years. The First Court of Appeals reversed the conviction, finding that the prosecutor conducted himself improperly by repeatedly alluding in final argument to an episode in which the deceased's moth-

er burst into tears and yelled at appellant. *Stahl v. State*, 712 S.W.2d 783 (Tex.App.— Houston [1st Dist.] 1986). In addition to the improper argument, the Court of Appeals suggested that there was some question as to whether the prosecutor actually orchestrated the original outburst. We granted the State's petition for discretionary review in order to review the correctness of the Court of Appeal's finding in light of several prior cases from this Court.[1] We find that the Court of Appeals was correct and affirm.

Arthur Newton, the deceased, had lived with appellant for approximately one month prior to the shooting. Newton had promised to pay appellant half of the rent and living expenses. Newton never paid any money to appellant. On two occasions, Newton "conned" appellant and received a total of $600. These facts lead to numerous arguments over money. Gregory Leonard, another roommate, testified that he had heard appellant threaten to kill Newton; however, on cross examination, Leonard conceded that appellant had not actually used the word "kill."

Leonard also testified that both he and appellant had unsuccessfully attempted to become drug enforcement informants. Newton, a drug user, believed appellant to be a "narc," and this lead to additional conflict between Newton and the appellant. This particular conflict was exacerbated by a policeman's business card which had been left for appellant on their apartment door.

On the night of the homicide, appellant and Rudy Validez, a mutual friend of Newton and the appellant, had been to a nightclub and returned to appellant's home. There, appellant and Newton began to argue about money and the business card. Validez, wanting to stop the argument, suggested the three of them go to his apartment for a beer. Once there, the argument resumed. Appellant left, and returned to Validez's apartment about five minutes later. When appellant leaned over, Newton grabbed a gun from appel-

lant's pants and struck appellant across the face with it. Newton then separated the clip from the gun. Appellant challenged Newton to go outside and fight, but Newton refused. Later, Validez told the two to leave.

As appellant and Newton left, appellant had the gun, and Newton had the clip. Appellant walked towards the apartment that he shared with Newton. The deceased went toward the parking lot and, a little later, to the apartment. Validez testified that he heard a single gunshot. Moments later, he heard appellant knocking at his door; however, Validez refused to open the door.

Appellant claims that when he returned to his apartment, he put the gun on a coffee table, removed his pants and prosthesis (appellant had lost a leg in an automobile accident), and lay on the couch. Soon after, Newton entered the apartment, took the gun, and inserted the clip. Appellant testified that Newton pointed the gun at him and told him to accompany him outside. At this point, appellant testified, he feared for his life.

Appellant lunged at Newton, and they landed in the open doorway. Appellant got up, and as Newton got up, he appeared to be coming toward appellant. As he did this, Newton yelled, "If I don't kill you, my cousin will." Appellant, who now had the gun, fired at Newton, hitting him behind the right ear. The location of the body and spent cartridge were consistent with this story. The location of the entry wound suggests that appellant fired at Newton from behind; however, one expert agreed that the wound might be consistent with some one lunging and then turning to avoid a shot.

Appellant next put on his pants and prosthesis and went for help. Eventually, he found Lt. Horn of the Harris County Sheriff's Department at a service station. He told Lt. Horn that he was a cripple, had been jumped by some one, and had shot his attacker. Lt. Horn seemed incredulous,

---

**1.** Review was granted pursuant to Tex.R.App. Pro. 200(c)(3). Our subsequent review of this case suggests that this initial observation is in question given our ultimate resolution of these issues.

and appellant said that he was a sharp-shooter and does not miss. Finally Lt. Horn was persuaded and followed appellant's pickup to the apartment.

Appellant gave statements to the police. He was variously described as proud of what he had done and upset over the incident.

At trial, the prosecutor attempted to prove the identity of the homicide victim by calling the deceased's mother, Sandra Newton, as a witness to identify a morgue photograph of her son. Prior to her being called, the trial judge brought Mrs. Newton into court in order to caution her about her upcoming testimony.

THE COURT: Mrs. Newton, in a little while or maybe tomorrow, you will be invited to come in the courtroom so you may identify a picture of what's supposed to be Arthur Newton.

Now, if that happens, ma'am, it will be in the presence of the Jury. I am sure that it will be a very painful experience for you. Nobody wants to put you through that experience.

But I cannot have any emotion shown in front of the jury when you do that. Now, if you can come and identify the picture as painful as it is for you to do without any emotion, then I will allow this to happen. If you can't do it without any emotion, without any crying or anything, then I cannot allow it. And I will have to proceed in a different manner. Can you assure me that if you come in here to identify your son's picture, that you can do it without any emotion?

MRS. NEWTON: I can assure you I will try. I don't—

THE COURT: I know. I understand.

MRS. NEWTON: I can't say what's going to happen.

The following is a transcript of Mrs. Newton's testimony:

[QUESTIONS BY THE PROSECUTOR]

Q: Mrs. Newton, I am going to show you State's Exhibit No. 25 [a full-faced morgue photograph of Arthur Newton], and I want you to take a look at State's Exhibit No. 25 and ask you if you can identify the person depicted in State's Exhibit No. 25?

A: Oh, my God.

Q: Can you identify that picture, Mrs. Newton?

A: Oh, my God. My baby. My God.

[DEFENSE COUNSEL]: Can we have the members of the Jury go to the Jury room?

THE WITNESS: May he rest in hell. May he burn in hell. Oh, my baby.

(Whereupon the jury leaves the courtroom).

The defense counsel requested a mistrial, claiming that the prosecutor had orchestrated the outburst. The motion was denied, but the trial judge agreed to instruct the jury to disregard the outburst and subsequently did so instruct them.

After rejecting a number of appellant's points of error, the Court of Appeals addressed the question of prosecutorial misconduct. This general issue was raised in three separate points of error; one discussed the witness outburst, and the other two concerned jury arguments made by the prosecutor. The Court of Appeals first set out the standards for reversal for both bystander outbursts and jury arguments. Based on the trial itself and appellant's bystander's bill, that court found that the harm of the outburst was compounded by the prosecutor's arguments. Given this situation, the Court of Appeals held that the cumulative effect of the outburst and improper jury arguments could not be cured by the judge's instructions to the jury.

The State's petition for discretionary review focuses on appellant's failure to prove that he was harmed by the outburst and jury arguments. The State would have had the appellant submit juror affidavits or produce jurors as live witnesses to testify concerning the effect of the outburst and arguments on their deliberations. The petition does not defend the propriety of any of the prosecutor's actions.

Appellant responds by re-urging the Court of Appeals' holding that the various errors had a synergistic effect. In addition, appellant asks this Court to consider the prosecutor's bad faith and queries this

Court how harm can be shown in light of Tex.R.Crim.Ev. 606.

This Court has considered the effect of bystander outbursts in a number of cases. E.g., *Landry v. State*, 706 S.W.2d 105 (Tex. Cr.App.1985) cert. denied, —— U.S. ——, 107 S.Ct. 242, 93 L.Ed.2d 167 (1986); *Ashely v. State*, 362 S.W.2d 847 (Tex.Cr.App.) cert. denied 372 U.S. 956, 83 S.Ct. 955, 10 L.Ed.2d 10 (1963); *Guse v. State*, 97 Tex. Cr.R. 212, 260 S.W. 852 (1924). These cases stand for the proposition that "[c]onduct from bystanders which interferes with the normal proceedings of a trial will not result in reversible error unless the defendant shows that a reasonable probability [exists] that the conduct interfered with the jury's verdict." *Landry*, supra at 112.[2]

The record reveals that the prosecutor had good reason to foresee Mrs. Newton's behavior. After Mrs. Newton shouted at appellant and began to sob, the jury was removed from the courtroom. During their absence, the following argument occurred:

[PROSECUTOR]: I think it would be unrealistic to expect a mother of somebody who has been brutally killed to take the witness stand and not show any emotion.

I would ask—Judge, this case is no different than any other case where the complainant or a close family member of a complainant has gone through a traumatic experience.

If you are trying any rape case, if you put a person on the stand that has been raped and that person has to re-live [sic] that event, that person has to point out the Defendant that raped her. I think it's no different in this case. What would happen in those cases, that it's very traumatic. You cannot expect a person who has been traumatized like that to take the stand and talk as if she is talking about what she is going to buy for dinner following that evening or tomorrow or next week or whatever.

I think it would be wholly unrealistic for this Court or any other Court to expect a mother of somebody who has been killed to come into Court and not to show any emotions to the best of her ability. She followed the Court's instruction [not to be emotional on the stand]. She did everything that she could do to follow the Court's instruction.

This colloquy demonstrates that reasonable minds would expect Mrs. Newton to be a highly emotional witness. This, along with Mrs. Newton's hesitance to promise she could be unemotional as a witness, gave the prosecutor ample foreknowledge of Mrs. Newton's likely behavior.

In addition to the predictability of what occurred, the prosecutor failed to take any of a variety of steps which would have likely prevented this outburst. (1) Defense counsel offered to stipulate to the identity of the deceased. Had the prosecutor accepted this stipulation [although not required to do so], Mrs. Newton would not have been forced to make the identification. (2) The prosecutor failed to show Mrs. Newton the morgue photograph of her son prior to putting her on the stand. (Statement of Facts, page 464). This preventative measure would have prepared her for the shock she received. Thus prepared, she would have been much less likely to shout at the appellant or sob in the jury's presence. And, if allowing Mrs. Newton to preview the photograph had caused her extreme distress, the prosecutor would have had actual notice of her emotional state and been better prepared to make an informed determination as to the threat she posed to an orderly trial. (3) The prosecutor could have used a witness who was less emotionally involved than Mrs. Newton. As the prosecutor argued at trial, the mother of a homicide victim may reasonably be expected to be an emotional witness. The prosecutor could easily have called another witness to identify the mor-

---

**2.** These cases are, technically, distinguishable from the instant case. They concern *bystander* outbursts rather than *witness* outbursts. This is a difference more of degree than kind. The added visibility of a witness over a mere bystander will increase the impact of an outburst on a jury. This factor suggests the need for added sensitivity to possible prejudice. It does not require that an entirely new standard be fashioned.

gue photograph.[3] Any one of these outlined steps would likely have prevented Mrs. Newton's outburst.

In the aftermath of Mrs. Newton's outburst, the prosecutor defended his conduct of the case by claiming that no one had the right to tell Mrs. Newton "you cannot take the stand and identify your son who has been killed."

[PROSECUTOR]: This Court does not have the right to tell Mrs. Newton that you cannot testify.

I am not about to tell Mrs. Newton or no other mother of a person who has been killed or person that has been brutalized that you cannot come to Court and testify.

That's her right. That's exclusively her right. I am not about to take that right away from her.

\*   \*   \*   \*   \*   \*

THE COURT: Her rights are not in trial right now, Mr. [Prosecutor]. Remember that.

[PROSECUTOR]: Yes, sir, Judge.

THE COURT: This is the trial of the State of Texas vs. the Defendant.

Like the trial judge, we find that the central goal of a trial is to provide the defendant with a fair hearing. There is no sound legal basis for asserting that a victim's family has any cognizable right to testify.[4]

Although the record does not expressly answer the question of whether the prosecutor intended the outburst to occur or was merely indifferent to such a risk, it does show that once the event happened, the prosecutor sought to exacerbate its impact on the jury. Despite the stern warning of the trial judge that the rights of Mrs. Newton were not at issue, the prosecutor argued in his closing argument at the "guilt" stage:

You have an opportunity to tell them that we don't like them causing grief to good people like Sandra Newton. You have an opportunity to let Mrs. Newton know that her son did not die in vain.

Defense counsel immediately objected to this statement, received an instruction for the jury to disregard the argument, and his motion for mistrial was denied. During the State's closing argument in the punishment phase, the following occurred:

[PROSECUTOR]: If you want to make certain that justice is done, tell Mrs. Newton and her family that you believe that Arthur's death—

[DEFENSE COUNSEL]: Excuse me, Your Honor. I object to his reference to the mother of the deceased in this Jury argument.

THE COURT: All right. Sustained.

[PROSECUTOR]: Tell the family of the deceased—

[DEFENSE COUNSEL]: Your honor, I object to his reference of the family of the deceased in this Jury argument.

THE COURT: Okay. Overruled. Go ahead.

[PROSECUTOR]:—That Arthur Newton did not die in vain.

Let them know that he did not see his last hours on the streets here in Harris County, Texas. Let them know that even as he lay in the morgue with his eyes open and still fixed, that the last person that he saw, this Defendant, was not the last image he will have to carry with him forever.

These persistent appeals in the face of adverse rulings speak loudly of the prosecutor's desire to use the outburst for inflammatory purposes. They evidence the prosecutor's intention to focus the jury on Mrs. Newton's reaction to the viewing of her dead son's photograph.

This Court has never established a general test for all types of prosecutorial misconduct. Instead, we have examined such claims on a case by case basis. In *Landry*

---

**3.** In fact, Mrs. Newton never actually identified the photograph, and the prosecutor proved identity with another witness, Hilliary Benton. The prosecutor could also have used witnesses already called by the state, to wit, Rudy Validez, who was present immediately before the shoot-

ing. Also, the morgue photograph was in evidence at the time Validez testified.

**4.** Art. 56.02, V.A.C.C.P. created a number of rights for victims of crime. This "Victim's Bill of Rights" cannot be read to create a right to testify.

*v. State,* supra, we rejected a claim of prosecutorial misconduct. In distinguishing the facts of that case from others in which we reversed for misconduct, we listed three factors. This brief list is neither exhaustive nor mandatory. It does, however, provide a starting point for identifying reversible conduct.

First, in all three cases cited,[5] the defendant objected to the conduct of the prosecutor. Secondly, the prosecutors were, by their actions deliberately violating an express court order. Thirdly, in reversing the above cases, this Court relied upon prosecutorial misconduct so blatant as to border on being contumacious.[6]

*Landry,* supra at 111.

In this case, all three factors are present. Appellant objected several times to Mrs. Newton testifying. Appellant objected before she was called as a witness. He objected after the outburst and preserved error. Likewise, there were objections to all three improper jury arguments. In only the second argument did appellant fail to obtain an adverse ruling. The prosecutor repeatedly alluded to Mrs. Newton's outburst on the witness stand, and the allusions were in direct contravention of prior rulings by the trial judge. Finally, the prosecutor's frivolous defense of Mrs. Newton's "right to testify" and his repeated, improper arguments referring to Mrs. Newton's outburst indicate a desire to impermissibly sway the jury. Thus, the three factors that *Landry* identifies suggesting reversible misconduct are present in this case.[7]

In *Koller v. State,* 518 S.W.2d 373 (Tex. Cr.App.1975), this Court examined a case in which the prosecutor repeatedly referred to improper evidence. During examination of one of the witnesses, information came out that a woman who had accompanied the defendant was a prostitute. We held this to be improper testimony because it tended to impute guilt through the associates of the defendant. *Id.* at 377. The State argued that this evidence was introduced accidentally as the result of an unresponsive answer to a question. We replied:

Even if the first reference to the alleged occupation of the defendant's associate was, as the State now claims, the accidental result of an unresponsive answer, the renewed questioning cannot be termed as such.

It is apparent that the only reason the prosecutor questioned the witness further on the subject was to emphasize the inadmissible evidence to the jury. As in *Gant v. State,* [513 S.W.2d 52 (Tex.Cr. App.1974)], we find that the State sought to introduce evidence which was clearly calculated to prejudice the appellant's right to a fair trial.

*Koller,* supra at 377–78. In *Koller,* this Court ultimately reversed the case on a number of different grounds but specifically noted that the "conduct of the prosecutor could have served no other purpose than to deprive the appellant of a fair trial

---

5. *Dexter v. State,* 544 S.W.2d 426 (Tex.Cr.App. 1976); *Boyde v. State,* 513 S.W.2d 588 (Tex.Cr. App.1974); *Stein v. State,* 492 S.W.2d 548 (Tex. Cr.App.1973).

6. In the instant case, we find that the prosecutor's conduct was blatant. It was not contumacious as we understand that term.

7. The *Landry* analysis is strengthened by the fact that the jury arguments were presented by the appellant as separate points of error in the Court of Appeals and that the Court of Appeals assigned as reversible error the improper jury arguments contained in appellants points of error 8 and 9.

In *Brandley v. State,* 691 S.W.2d 699 (Tex.Cr. App.1985), the prosecutor argued:

It is fair for you to think about the feelings of the father who lost his baby daughter and it is fair for you to think about how you would feel if you lost your children....

*Brandley,* supra at 712. Stating that "[t]he argument complained of does not fit into any of the four categories; it is rather a plea for abandonment of objectivity," we held that pleas to the expectations of the victim's family are improper argument. In *Brandley,* supra, there was a curative instruction; however, no such instruction was given in the instant case. In the instant case, failure of the trial court to sustain the objection was error. We believe from our analysis, however, that the synergistic effect of the jury arguments and the witness outburst combined, more effectively underscore the error that occurred in this case.

by prejudicing the jury against him." *Id.* at 378.

The significance of *Koller* is twofold. First, it stands for the proposition that an initially innocent trial error may be tainted by a prosecutor's intentional efforts to exacerbate its effect. Second, as a jury has its attention focused on improper testimony, the initial impression created by said testimony, curable by a simple instruction, escalates in to cumulative harm. Both of these principles play a large role in the instant case.

In attempting to show harm, appellant perfected a bystander's bill of exception in which he showed the proximity of the witness Newton to the jury, the audibility of the witness's comments, and the fact that all members of the jury could see and hear what transpired. The factors suggesting harm lie in the cumulative effect of the outburst and the improper arguments. After the prosecutor invited the jurors to consider the outburst on three separate occasions, there is a great likelihood that the jury was affected in some way. This is particularly true because the trial judge effectively ratified the prosecutor's final plea to consider the outburst. As set out in *Brandley,* ante note 7, such appeals "to abandon reason" are improper. They distract the jury from the actual evidence of whether or not the defendant committed the crime of which he is accused. *Koller,* supra at 378, and cases cited therein. Therefore, we cannot say that the cumulative effect of these errors was harmless beyond a reasonable doubt. See Tex.R. App.Pro. 81(b)(2).

The State suggests that the jury's imposition of a near-minimum sentence proves that the error was harmless. This is an untenable position. First, appellant was convicted of the offense in the face of a reasonably plausible and hotly contested self-defense claim. Second, the sentence imposed did not represent the minimum punishment under the law. Appellant could have received two fewer years imprisonment or a probated sentence.

Finally, the State argues that the outburst was harmless because it was not relevant to any disputed fact issue. We agree with this observation as to relevancy.

Viewed in another light, however, the prosecutor could hope to elicit little legitimate information by calling Mrs. Newton as a witness, and this fact goes to the heart of the holding in the instant case. The outburst added nothing of value to the trial and, indeed, coupled with the infirm final arguments, posed a significant potential to inflame the jury.

Since we cannot say that the errors committed in the trial were harmless beyond a reasonable doubt, see Tex.R.App.Pro. 81(b)(2), the judgment of the Court of Appeals is affirmed.

ONION, P.J., and DAVIS, J., concur in result.

MILLER and WHITE, JJ., dissenting.

### ORDER

MILLER, Judge.

The State's Motion for Rehearing is denied.

This appeal is abated to the trial court with instructions that it conduct a hearing pursuant to the full procedure and steps outlined in *Keeton v. State,* 749 S.W.2d 861, (Tex.Cr.App.1988) (opinion following abatement).

IT IS SO ORDERED.