Death Opinion








 








IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 74,139






ALVIN AVON BRAZIEL, JR., Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM DALLAS COUNTY






 Holcomb, J., delivered the opinion of the Court, in which Meyers, Price,
Womack, Keasler, Hervey, and Cochran, JJ., joined. Keller, P.J., joined the
opinion of the Court except its discussion of point of error number two, with
which she concurred in the result. Johnson, J., joined the opinion of the
Court except its discussion of point of error number four, with which she
concurred in the result.



OPINION




 Appellant was convicted in July 2001 of capital murder. Tex. Penal Code Ann.
§19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of
Criminal Procedure Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced appellant to
death. Art. 37.071 §2(g). (1) Direct appeal to this Court is automatic. Art. 37.071 §2(h). 
Appellant raises eleven points of error. We affirm.

 In his second point of error, appellant claims the trial court erred in denying his request
to suppress the out-of-court photographic identification of appellant by witness Lora White,
in violation of the Due Process Clause of the United States Constitution. Appellant argues that
the identification was tainted because the police officer who showed the witness the photo
lineup told her beforehand that a suspect had been identified through a DNA match.

 It was established at the suppression hearing that Lora and Douglas White were walking
along a jogging trail on the Eastfield College campus on the evening of September 21, 1993. 
A man carrying a pistol stepped out from behind some bushes and demanded money. Lora
testified that the man was within about four steps of them and was not wearing anything
covering his face. The man shot Douglas twice and then took Lora to some nearby bushes
where he sexually assaulted her. Douglas ultimately died as a result of the shooting. Lora
observed the perpetrator closely throughout the offense. During the sexual assault, the man
was within inches of Lora's face. The encounter with the man lasted from ten to twenty
minutes. Although it was a dark night, Lora testified that the trail was close to a highway and
a parking lot where there were lights. The night of the offense Lora described the offender to
police as a black man between the ages of 19 and 24, 5'6" to 5'8" in height, and weighing 140
to 160 pounds. She also described him as wearing a bandana on his head, an orange wind
breaker and calf-length baggy shorts. An initial composite drawing was made by the Dallas
police department within a couple of weeks of the offense, but Lora was not satisfied that it
was an accurate depiction. A second drawing was done by a different artist in February of
1994, which Lora testified accurately resembled the offender. Lora viewed a photo lineup in
1994 but did not identify anyone as the offender.

 In February 2001, Lora was contacted by Detective Michael Bradshaw, who informed
her that they had found a DNA match. Bradshaw testified that he probably told Lora the
suspect's age, although Lora testified that Bradshaw did not tell her anything about the suspect
except that he was incarcerated. A week to ten days later Lora viewed a photo lineup in
Bradshaw's office. The lineup consisted of six photographs. All six were black males
approximately the same age. Bradshaw did not tell Lora whether or not the suspect they had
located through DNA evidence would be in the lineup. Lora was given written instructions
about viewing the lineup, providing in part that "[t]he person who committed the crime may or
may not be in the group of photographs," that "[i]t is equally important to eliminate innocent
persons as it is to identify those persons responsible," and that "[y]ou are in no way obligated
to identify anyone." After reading and signing the instructions, Lora unequivocally identified
appellant as the offender. Lora testified that she would be able to identify appellant in the
courtroom based on her contact with him on the night of the offense, even if she had not
viewed the lineup.

 A couple of weeks before the suppression hearing, Bradshaw and Lora went to the
courthouse for a meeting with the prosecutor. Bradshaw decided to show Lora the courtroom
so that she could easily find it on the day of trial, not realizing that jury selection was ongoing
in appellant's case. They looked in at the courtroom through the window at the back for about
ten to fifteen seconds. Lora testified that she only saw the back of appellant's head. 

 Appellant argues that when Bradshaw told Lora they had found a suspect through a DNA
match, he tainted the identification by suggesting that the suspect would be in the lineup. 
Appellant also argues that the lineup was suggestive because appellant's photograph was
distinguishable from the others. He claims that individuals in three of the other photographs
had skin tone lighter than appellant's.

 A pretrial identification procedure may be so suggestive and conducive to
misidentification that use of the identification at trial would deprive the defendant of due
process. Barley v. State, 906 S.W.2d 27, 32-33 (Tex. Crim. App. 1995), cert. denied, 516
U.S. 1176 (1996). We apply a two-step test to assess the admissibility of an in-court
identification: (1) whether the out-of-court procedure was impermissibly suggestive; and (2)
whether the suggestive procedure gave rise to a very substantial likelihood of irreparable
misidentification. Id. at 33 (citing Simmons v. United States, 390 U.S. 377 (1968)). In
applying this analysis, we view the totality of the circumstances and make a determination of
the reliability of the identification. In determining whether a very substantial likelihood of
irreparable identification has occurred, several factors are taken into consideration: (1) the
witness' opportunity to view the criminal act, (2) the witness' degree of attention, (3) the
accuracy of the suspect's description, (4) the level of certainty at the time of confrontation,
and (5) the time between the crime and confrontation. Id. at 34-35. These factors are weighed
against the corrupting effect of any suggestive identification procedures. Id.

 The photo array itself was not impermissibly suggestive. All of the individuals were
black males of approximately the same age. Although there are slight variations in skin tone
between individuals, appellant does not stand out as significantly or noticeably darker than the
others. The fact Bradshaw informed Lora prior to the lineup that they had found a suspect is
more troubling. But even if such exchange rendered the procedure impermissibly suggestive,
appellant does not meet his burden in proving that the procedure gave rise to a very substantial
likelihood of irreparable misidentification in this case.

 Although it was nighttime and there was no direct lighting, Lora had ten to twenty
minutes in which to view the assailant's uncovered face at a very close proximity. Lora's level
of attention was high considering the intensity of the circumstances. Lora gave a general
description of the offender on the night of the offense and gave considerably more detailed
information to two composite artists later. Lora's descriptions were consistent with
appellant's physical characteristics. Lora's identification of appellant in the lineup was
unequivocal. Even though the offense occurred more than seven years before the lineup, the
other factors weigh heavily in support of the reliability of Lora's identification. The lineup
procedures were not so corruptive as to outweigh the factors supporting the identification. 
Brashaw did not tell Lora that the suspect would appear in that particular lineup. To the
contrary, Lora was specifically instructed in writing that the offender "may or may not" be in
the lineup and that she was under no obligation to identify anyone. Finally, Lora testified that
she could have identified appellant in court even without having seen the earlier photographic
lineup. In these circumstances, the trial court did not err in denying appellant's motion to
suppress the out-of-court identification evidence. Point of error two is overruled.

 In point of error one, appellant claims the trial court abused its discretion in admitting
the State's DNA evidence on the grounds that proper DNA testing procedures were not
followed and that the DNA results were not reliable due to error in the actual testing process. 
The trial court's task under Rule of Evidence 702 is to determine whether the proffered
scientific evidence is sufficiently reliable and relevant to assist the jury. Kelly v. State, 824
S.W.2d 568, 573 (Tex. Crim. App. 1992); Tex. R. Crim Evid. 702. Appellant's claim is
directed at the reliability issue.

 Reliability is established by showing (1) the validity of the underlying scientific theory,
(2) the validity of the technique applying the theory, and (3) the proper application of the
technique on the occasion in question. Id. The trial court is the sole judge of the weight and
credibility of the evidence presented, and the reviewing court looks at the evidence in the light
most favorable to the trial court's ruling. Kelly, 824 S.W.2d at 573.

 The general rule is that the reviewing court considers only evidence presented at the
hearing on a motion to suppress and does not resort to testimony subsequently elicited at trial
because the trial court's ruling was based only on the hearing testimony. Rachal v. State, 917
S.W.2d 799, 809 (Tex. Crim. App.) (plurality op. as to another point of error), cert. denied,
519 U.S. 1043 (1996); Hardesty v. State, 667 S.W.2d 130, 133 n.6 (Tex. Crim. App. 1984). 
But when the issue is consensually re-litigated by the parties at trial, consideration of the trial
evidence is appropriate. (2) Rachal, 917 S.W.2d at 809; Hardesty, 667 S.W.2d at 133 n.6. Here,
the reliability of the tests was litigated extensively by both parties before the jury. Therefore,
we will consider the evidence presented at the 702 hearing as well as the evidence presented
at trial.

 Tests were conducted on the DNA in appellant's case by Genescreen in Dallas and by
a Department of Public Safety (DPS) lab in Garland. In the Rule 702 hearing, expert witness
Paul Goldstein, a professor of Genetics at the University of Texas at El Paso, testified for the
defense. Goldstein testified that there were problems in the testing procedures at both labs,
resulting in unreliable tests. He testified that the lab reports reflected unacceptable
aberrations, which he viewed as producing unreliable results. Goldstein also stated that the
tests were scientifically invalid because more modern and accurate technology is now
available. 

 On cross-examination, Goldstein conceded that neither deviation from protocol nor the
alleged aberrations would necessarily produce or indicate a false match. At the end of the
hearing, the parties became aware that Goldstein had not received an external audit report on
the Garland DPS lab. Goldstein had mistakenly reviewed an audit report for a DPS lab in
Austin, believing it pertained to the Garland lab. The State agreed to furnish the report to
Goldstein. The trial court ruled the DNA evidence admissible. The court noted that the 702
hearing might be continued later if appellant wanted to discuss the external audit report for the
Garland lab.

 Katherine Long, a forensic scientist at Genescreen in Dallas, testified for the State
before the jury. She stated that she performed the DNA testing comparing appellant's DNA
with the DNA from the victim's rape kit. Long testified that she used the standard protocol and
procedures accepted in the scientific community. She maintained that the Genescreen
laboratory has internal quality controls and that she followed those guidelines during the
testing. Long also testified that the lab does utilize the more advanced DNA testing technology
referred to by Goldstein. However, Long stated that the advanced technology was
inappropriate for forensic testing in humans. Long testified that the tests she performed in
appellant's case were accurate and reliable and that appellant's DNA profile matched the
samples from the victim's rape kit.

 Appellant called Goldstein, who testified before the jury that the test results in
appellant's case were not reliable. Goldstein claimed the analyses done in appellant's case
were problematic.

 The next day, the Rule 702 hearing was continued out of the presence of the jury. 
Appellant recalled Goldstein, who testified that protocol at the lab was not followed and
therefore test results were not reliable. On cross-examination, Goldstein conceded there was
nothing to show that there was a false match in appellant's case. The court clarified that the
date of the audit report was November 2001. Two separate tests were run in appellant's case,
in July 2000 and February 2001. Appellant's objection to the DNA tests was again overruled.

 When the jury returned, the State called John Donahue, Serology Expert at the DPS
Garland Lab, who also performed DNA analyses on samples from Lora White, Douglas White,
and appellant. Donahue testified that protocol was followed and that his findings were
consistent with Long's findings. 

 Appellant recalled Goldstein, who testified that the procedures and protocol at the
Garland lab were not acceptable. Finally, the State recalled Long to respond to Goldstein's
criticisms. She testified that the tests were properly conducted and the results accurate.

 Viewing the evidence in a light favorable to the trial court's ruling, the State's witnesses
testified to the reliability, validity, and proper application of the DNA testing procedures and
met each challenge by appellant with reasonable and coherent explanations as to why the tests
utilized and the results should be viewed as reliable. Massey, 933 S.W.2d at 152. Appellant's
first point of error is overruled.

 In his third point of error, appellant claims the trial court should have granted his
request for a mistrial after the State prompted an extreme emotional outburst from the victim's
wife, Lora, in front of the jury. During Lora's direct examination at the guilt or innocence
phase of the trial, the prosecutor showed her an autopsy photograph of the victim, prompting
the following response:

 [Lora]: God, why did you have to do that? I do not believe you did that. 
(Crying.)

 

 (Witness exiting courtroom.)


 [The Court]: All right. Let's send the jury out please.


 [The Bailiff]: All rise.


 [Lora]: Oh, God. Oh, God. Oh, God. (Crying.)


 (Witness heard from outside the courtroom.)


 [Lora]: I can't believe you didn't tell me you were going to do that. (Crying.) 
Why did you do that?


 (The jury exits the courtroom.)

 Appellant moved for a mistrial, arguing that the State attempted to elicit an emotional
response from the witness and that the prejudicial effect of the outburst could not be
overcome. The State responded by stating that it had in fact warned Lora that she would be
shown a photograph and denied that it attempted to elicit an emotional response. Appellant's
motion was denied. When Lora returned to the courtroom after a recess, she apologized and
acknowledged that the prosecutor had told her ahead of time that during her testimony he
would show her an autopsy photo of her deceased husband.

 Appellant relies on Stahl v. State, 749 S.W.2d 826 (Tex. Crim. App. 1988), to support
his argument. In Stahl, the Court addressed the question of prosecutorial misconduct in
connection with an emotional outburst by a witness. Prior to the State's calling the deceased's
mother as a witness, the court cautioned the witness against an emotional outburst, asking for
some assurance that she could identify her son's photo without showing emotion. The witness
told the court that she would try but could not say for sure how she would respond. When the
picture was shown the witness responded as follows:

 A. Oh, my God.

 Q. Can you identify the picture, Mrs. Newton?

 A. Oh, my God. My baby. My God.

 [DEFENSE COUNSEL]: Can we have the members of the Jury go to the Jury
room?


 [THE WITNESS]: May he rest in hell. May he burn in hell. Oh, my baby.

Id. at 828. The defendant requested a mistrial, claiming the prosecutor had orchestrated the
outburst. This Court noted that although the record did not reflect whether the prosecutor
intended the outburst or was merely indifferent to such a risk, once it occurred, the prosecutor
exacerbated its effect on the jury. Id. at 830. Despite an admonishment by the court, the
prosecutor referred three times to the deceased's mother in closing arguments. In light of the
prosecutor's repeated statements during closing arguments in direct and deliberate
contravention of the trial court's order, we held the prosecutor's conduct was reversible error. 
Id. at 831 (citing Landry v. State, 706 S.W.2d 105 (Tex. Crim. App. 1985), cert. denied, 479
U.S. 871 (1986)).

 The instant case is distinguishable. The statements by Lora during her outburst were not
directed at the defendant. While the prosecutor referred to the outburst once during his
closing argument, he was responding to an argument of defense counsel. And appellant did not
object to the prosecutor's argument. The prosecutor's conduct did not rise to the level of the
misconduct described in Stahl. Appellant has not shown that the trial court otherwise abused
its discretion in denying his mistrial. Point of error three is overruled.

 In point of error four, appellant claims the trial court erred in admitting into evidence
appellant's prison records, which were not certified or self-authenticating. During the
punishment phase of the trial, the State offered into evidence records from the Texas
Department of Criminal Justice -- Institutional Division (TDCJ--ID) reflecting incidents of
rule violations by appellant while incarcerated. Appellant objected to the admission, stating,
"I don't think it's properly authenticated and not a proper predicate at this time." On appeal,
he argues that the records were not properly authenticated because they did not bear the
official seal of the TDCJ certifying that they are true and correct.

 Appellant's general objection failed to preserve error in the absence of anything in the
record reflecting that the court or opposing counsel knew the specific basis of appellant's
claim. See Lankston v. State, 827 S.W.2d 907, 908-909 (Tex. Crim. App. 1992)(reaffirming
rule that where correct ground for exclusion is obvious to judge and opposing party, general
or imprecise objection is sufficient to preserve error). Rules of Evidence 901 and 902,
pertaining to authentication and self-authentication of documents, contain numerous provisions
under which a document might be deemed objectionable. In addition, Rules of Evidence 1001
through 1007 pertain to the admissibility of various kinds of writings, including public records
under Rule 1005. Some of these rules may have been potentially applicable as well. See Smith
v. State, 683 S.W.2d 393, 404 (Tex. Crim. App. 1984)(holding objection for "failure to lay
predicate" too general to preserve error). There is no showing that the specific grounds were
apparent or known to the parties. When appellant did not specify the ground for his claim, the
State did not have the opportunity to respond and the trial court was not apprised of the basis
on which to rule. In these circumstances, appellant has failed to preserve this issue for appeal. 
Point of error four is overruled.

 In his fifth point of error appellant claims the trial court erred in informing the jury
about the forty-year minimum for parole eligibility in the case of a life sentence, but further
instructing the jury not to consider that minimum when answering special issue one on future
dangerousness. Appellant relies on Simmons v. South Carolina, 512 U.S. 154 (1994), and the
opinion of four justices respecting the denial of certiorari in Brown v. Texas, 522 U.S. 940
(1997)(Stevens, J., joined by Souter, Ginsburg, and Breyer, JJ.). Appellant did not object to
the court's instructions at trial, but claims the error caused him "egregious harm." Almanza
v. State, 686 S.W.2d 187, 192 (Tex. Crim. App. 1985). This argument has been raised and
rejected previously. Feldman v. State, 71 S.W.3d 738, 756-57 (Tex. Crim. App. 2002). 
Point of error five is overruled.

 In point of error six, appellant claims the trial court erred in failing to submit in the jury
instructions at punishment definitions of the terms "probability," "criminal acts of violence,"
or "continuing threat to society." Appellant argues that the failure to define these terms
prevented them from serving the function of narrowing the class of persons eligible to receive
the death penalty, rendering the charge unconstitutionally vague. This argument has been raised
and rejected in other cases. Id. at 757. Point of error six is overruled.

 In his seventh point of error, appellant claims the Texas death penalty scheme violates
his rights against cruel and unusual punishment and to due process of law under the Eighth and
Fourteenth Amendments by requiring at least ten "no" votes for the jury to return a negative
answer to the punishment special issues. This argument has been raised and rejected
previously. Wright v. State, 28 S.W.3d 526, 537 (Tex. Crim. App. 2000), cert. denied, 531
U.S. 1128 (2001); Chamberlain v. State, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999), cert.
denied, 528 U.S. 1082 (2000). Point of error seven is overruled.

 In points of error eight and nine, appellant claims the Texas death penalty scheme is
unconstitutional under both the United States and Texas constitutions "because of the
impossibility of simultaneously restricting the jury's discretion to impose the death penalty
while also allowing the jury unlimited discretion to consider all evidence mitigating against
imposition of the death penalty." Appellant relies on Justice Blackmun's dissent in Callins
v. Collins. 510 U.S. 1141 (1994)(Blackmun, J., dissenting). This argument has been
addressed and rejected. Hughes v. State, 24 S.W.3d 833, 844 (Tex. Crim. App.), cert. denied,
531 U.S. 980 (2000). Points of error eight and nine are overruled.

 In points of error ten and eleven, appellant claims the cumulative effect of the above-enumerated constitutional errors violated his rights under the state and federal constitutions. 
We have found no constitutional errors. Chamberlain, 998 S.W.2d at 238 (stating that non-errors may not in cumulative effect cause error). Points of error ten and eleven are
overruled.

 The judgment of the trial court is affirmed.


Delivered October 1, 2003


Do not publish
1. Unless otherwise indicated, all references to articles refer to those in the Texas Code of Criminal
Procedure.
2. We have held that the three criteria for reliability under Kelly must be proven to the trial court
outside the presence of the jury before the evidence is admissible. Massey v. State, 933 S.W.2d 141,152
(Tex. Crim. App. 1996); Campbell v. State, 910 S.W.2d 475, 478-479 (Tex. Crim. App.1995), cert.
denied, 517 U.S. 1140 (1996). However, a defendant's decision to re-litigate the reliability issue at trial
allows the reviewing court to consider all of the evidence in its review. See Rachal, 917 S.W.2d at 809.