TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-97-00357-CR







Michael Earl Cruthird, Sr., Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT


NO. 47,106, HONORABLE RICK MORRIS, JUDGE PRESIDING








 Appellant Michael Earl Cruthird was convicted of the offense of capital murder of a child. 
See Tex. Penal Code Ann. § 19.03(a)(8) (West 1994 & Supp. 1998). The State did not seek the death
penalty; appellant's punishment is imprisonment for life. Appellant asserts that the evidence is neither legally
nor factually sufficient to support the jury's verdict. He also complains that (1) the trial court erred in failing
to charge the jury on lesser included offenses, (2) he was denied the effective assistance of counsel, and
(3) he was denied a fair trial because of prosecutorial misconduct.

 In reviewing the legal sufficiency of the evidence, the test is whether, after viewing the
evidence in the light most favorable to the prosecution, any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319
(1979); Staley v. State, 887 S.W.2d 885, 888 (Tex. Crim. App. 1994); Moreno v. State, 755 S.W.2d
866, 867 (Tex. Crim. App. 1988). This standard of review is the same for both direct and circumstantial
evidence. Geesa v. State, 820 S.W.2d 154, 162 (Tex. Crim. App. 1991); Mack v. State, 859 S.W.2d
526, 527 (Tex. App.--Houston [1st Dist.] 1993, no pet.).

 It was alleged that appellant "did then and there intentionally and knowingly cause the death
of Destiny Masha Adkins, hereinafter styled the complainant, by striking the complainant with his hand and
fist, and by throwing and shoving the complainant against an object to the grand jury unknown, and by
shaking the complainant, and by using other instruments and means against the complainant unknown to
the grand jury, and the said Destiny Masha Adkins was then and there an individual under six years of age."

 In late July 1996, Wendy Cox, who had been living in Tyler, came to Temple seeking
employment. She brought her children two-year-old Andrea and fourteen-month-old Destiny with her. 
Wendy and Melissa Cruthird had been girlhood friends and attended school together in Austin. Wendy
and her children moved into a two bedroom apartment with Melissa and her husband and their three
children, ages two and one-half years, one and one-half years, and four months. Appellant, a soldier
stationed at Fort Hood, was Melissa's husband. After Wendy moved into the apartment, she and Melissa
on most evenings would visit night spots, bars, and the barracks at Fort Hood, leaving the five young
children with appellant. The women would not return to the apartment until the early morning hours. It
"bothered" appellant that his wife and Wendy went out every night and he began to think Melissa "was
cheating on [him]." Appellant had decided he would confront Melissa about her "routine" of going out
every night, leaving him with the children and not returning until the early morning hours.

 On Monday, August 12, appellant did not work and was home in the afternoon. Melissa
and Wendy told appellant that they were going out to apply for jobs, but instead they went to Fort Hood
to a barracks to look for Melissa's I.D. card which she had left there the previous Saturday night. After
a fruitless search for the I.D. card, the women returned to the apartment. The three adults played with the
five children in the apartment courtyard before supper. After supper, all of the children seemed to be in
good health before they were put to bed. Melissa and Wendy left the children with the appellant and
returned to Fort Hood to continue looking for Melissa's I.D. card.

 At about 10:00 p.m. that night, Allanda Judi, the Cruthirds' neighbor, and the apartment
complex assistant manager, Diane Zamora, were visiting with each other while they waited for their children
to return from the swimming pool. While they were standing in front of Cruthirds' apartment, these women
heard "a very loud thud that rattled the door and windows, and it was so loud we both stopped our
conversation." It sounded like "a vehicle had run into the building."

 Appellant testified that after Melissa and Wendy left the apartment that Monday, he
watched television and at about 10:30 p.m. he went into the bedroom to check on the children, where he
found Destiny with bed sheets wrapped around her neck; she was not breathing and had a bluish
coloration. Appellant took Destiny from the bed and started CPR in an effort to resuscitate her. When
he seemed to be failing in his efforts, he went to a pay telephone in the complex and made a 911 emergency
call. After making the 911 call, appellant returned and continued CPR.

 At approximately 10:45 p.m., Ronald Snider, "an apparatus operator with the City of
Temple Fire Department" and a resident of the apartment complex "was preparing to retire for the evening
. . . [when he] heard an alarm come over [his] scanner." Snider, who was trained in CPR methods, heard
the distress call on his scanner that a child in apartment 806 was not breathing. Snider, who lived
"approximately 50 feet from that apartment," went to apartment 806; the door was open, he looked up the
stairs and "saw a gentleman stooped over a small child." Snider ran up the stairs, identified himself "and
asked the gentleman what happened . . . . The gentleman told me he had found the child in her bed with
the sheets wrapped around her neck." Snider testified "the child was cynotic. By that, I mean she had a
bluish coloration around her mouth area, also her hands and feet had a grayish color to them which is
indicative of someone thats not breathing. I administered the required two quick breaths to see if she could
possibly start breathing on her own; however, she didn't. . . . I started compressions at a five-compression-to-one-breath ratio which is the standard for an infant in CPR . . . I continued . . . until shortly
afterwards when Engine 4 crew arrived." Snider "learned" the gentleman with the child was Mr. Cruthird;
there were no other adults in the apartment.

 In response to appellant's 911 call, the Temple Fire Department sent Engine 4; a Scott and
White Hospital unit was also dispatched to apartment 806. When paramedics on Engine 4 got to the
apartment, they found the victim "pulseless and apneic." Captain Kent Yarley and Larry Sievers, using a
combination of medical equipment, attempted to resuscitate the victim. By the time the paramedics arrived
at the hospital with the victim, a monitor showed some electrical activity passing through the victim's heart;
using a stethoscope, the paramedics "confirmed heart beats." The paramedics left the victim with hospital
emergency personnel and notified Temple Police Officer Lila Price.

 Deborah R. Douty, a physician in the pediatric intensive care unit at Scott & White
Hospital, came to a treatment room to assist the victim who was undergoing resuscitation. Dr. Douty found
the victim comatose without a heart rate and without any spontaneous or pain responsive movement. "She
had no spontaneous respiratory effort on her own. She was in some degree of shock." Dr. Douty "never
left the proximity of the [victim's] room throughout the rest of the night." After the victim became more
stable, a CT scan of her head was made. Dr. Douty interviewed appellant and Wendy Cox for the purpose
of "obtaining a detailed history" of what had happened to the victim.

 Concerning the victim's care, Dr. Douty testified:


Her care involved regulating the ventilator such that we kept her, her work of breathing
normal; we kept her CO2 and her blood and her oxygenation level maintaining good heart
output so that we got blood to all of her vital organs, maintaining as decreased pressure
inside of her head as we could, trying by different maneuvers, medical maneuvers, to keep
the pressure inside of her head so that further damage would not be done; and, ensuring
that we got adequate blood flow to her brain so that further damage would not be done
to her brain. Those are primarily the goals of treatment, and there are different modalities
used in obtaining those.



 After treating the victim and interviewing appellant and the victim's mother, Dr. Douty
concluded that:


Destiny had severe intracranial trauma consisting of subdural hematomas. She had severe
encephalopathy, and that means a very altered change in her brain status that I estimated
was secondary to severe hypoxia which resulted from a cardiac and pulmonary arrest, that
she had some event that caused her to quit breathing. She went without oxygen for
sometime and then her heart stopped. And then she went without blood flow for
sometime, as a result of this her brain had suffered a severe insult . . . .


I also diagnosed that she had coagulopathy which is an alteration in her blood clotting
ability which is very often seen in this type of injury because of the amount of blood in the
head, a lot of the normal products that cause your blood to clot are used up.


I diagnosed some external bruises and an external mark, a linear mark on her neck.


And I also concluded after obtaining the histories and examining and getting the test results
on Destiny that the history that I obtained did not explain the injuries and that there was
some sort of nonaccidental trauma involved.



 Dr. David Ray Hardy who had been director of the pediatric intensive care unit at Scott
& White Hospital for fifteen years testified that:


 [A]t the time that I saw her she was not moving. The nurses had noticed occasional
twitches in her arms, but she wasn't breathing on her own. She had no real spontaneous
movement. She was on the ventilator. She had IVs in her. Her pupils were no longer
reacting. The pupils are the black parts of the eyes that constrict and enlarge whenever
light is in the room. Those no longer were functioning. It was my impression at that time
that she was severely brain injured and possibly impending brain death.


* * * * *



 So we took care of her airway and her breathing and her circulation. The EMS crew
had already done a good job, got her heart started again. We just continue to support
that. 


 After that we took her to the CT scanner to see what type of injuries might be -- we
might be looking at inside her head, whether there was something that surgery could take
care of.


 She did have some bleeding within the brain. You could see a small thin layer of
blood in the middle of the brain. And at the base, at the back of the brain we could see
a little thin layer of blood. But what we mainly saw was that the brain was kind of a
homogeneous wound, gray in color; whereas, usually you have different colors within the
brain on the CT scan. When you see the homogeneous color it means that you've got a
severe brain injury, either lack of oxygen or severe swelling was occurring. That's what
we saw on CT with her.


 Since there wasn't anything neurosurgically that we could do, we couldn't just go in
and pull out blood, it wasn't like a huge blood clot shoving the brain over that you could
go in and remove and everything would be okay. It was the whole brain was involved in
this process. We took her back up to the ICU and kept supporting her with the ventilator.


 Later that day she developed more blood pressure problems as happens when
children go into further brain injury, and eventually she had brain death.


 At that point we got into further problems with her metabolic processes, but that was
all related to just brain death.


 She -- We also evaluated her for fractures. We really didn't see any bone fractures
on her x-rays. We looked at her skin, looked her over very well.


 I made a drawing in the chart of bruises that I saw and described the colors of the
bruises which would help me, again, try to age those bruises.


 We did blood studies looking to see if there [were] any problems with the child's
electrolytes, problem with the child's blood or bleeding. We looked for, oh, blood
disorders that children could be born with that would allow them to bleed easy. All of
those were negative in her. We found no inherited blood disorders that would have
allowed her to be an easy bleeder or free bleeder or hemophiliac. None of that was
present. She did have a mild elevation in one of her clotting studies which is common after
a head injury with some bleeding in the brain. But tissues in the brain tend to release
almost like an anticoagulant that will made the clotting studies prolong slightly, but it wasn't
anything that we even felt like we needed to treat at that point.


* * * * * *



 By 4:00 o'clock that afternoon on the 13th we had already done several other exams
on her. At that point we were no longer seeing any activity that would be related to brain
activity. We would see some minor reflexes that you can see with any nerve, but you --
there was nothing that indicated there was any brain activity.


 We did a cerebral blood flow study which basically means that we took some
radioactive material, put it into her vein, and put a very large Geiger counter over her head
that then maps out where that radioactive material goes. If it goes into the brain through
any of the blood vessels, we know that the brain is alive and they have blood flow there. 
This showed that there was no blood flow within the brain, and that again confirmed that
she was brain dead.


At that point we talked with the parent and told her her child had died and discussed with
her whether she wanted organ donations or not, and went from there.



 Dr. Joseph Guileyardo, Deputy Chief Medical Examiner at the Southwestern Institute of
Forensic Sciences in Dallas, conducted an autopsy of the victim's body. In his autopsy report, Dr.
Guileyardo concluded that the victim's death was the result of homicide; she "died of blunt force injuries
alone or in combination with shaking. The pattern is that of non-accidental injury."

 Viewing the evidence in the light most favorable to the prosecution, the jury as the trier of
fact could rationally find all of the elements of the offense were proved beyond a reasonable doubt. We
hold the evidence is legally sufficient to support the verdict.

 We will now review all of the evidence to determine whether the evidence factually
supports the jury's verdict. In reviewing factual sufficiency of the evidence we view all the evidence without
the prism of in the light most favorable to the prosecution; we set aside the jury's verdict only if it is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. See Clewis v.
State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). Clewis approved this standard of review first
articulated in Stone v. State, 823 S.W.2d 375, 381 (Tex. App.--Austin 1992, pet. ref'd untimely filed). 
More recently the Court of Criminal Appeals has admonished: "We emphasize that in performing a factual
sufficiency review, the courts of appeals are required to give deference to the jury verdict, examine all of
the evidence impartially, and set aside the jury verdict 'only if it is so contrary to the overwhelming weight
of the evidence as to be clearly wrong and unjust.'" Cain v. State, 958 S.W.2d 404, 410 (Tex. Crim.
App. 1997) (quoting Clewis, 922 S.W.2d at 129).

 The thirty-year-old appellant had been in military service since he was nineteen years old;
he was a corporal and had served in Korea and in Saudi Arabia during Desert Storm. While serving at
Fort Hood, appellant met and married Melissa and fathered their three children. Numerous family
members, friends, and fellow servicemen testified that appellant was a good father, had a quiet, calm
disposition, and was a good soldier. Other people had entrusted appellant with the care of their children. 
Appellant did not use drugs and seldom drank alcoholic beverages. Appellant had no prior criminal record
and testified that he had never before been arrested.

 Appellant's trial testimony was consistent with his pretrial statement. He denied harming
the victim, and testified "I do not know" how this happened. Appellant's main defense was that the victim's
fatal injuries were caused by two falls down a flight of stairs. Although there was conflicting evidence
concerning when the victim fell down the stairs, the times most likely were on Thursday and Sunday before
her death on the following Tuesday. Evidence shows that the victim fell down the stairs at the apartment
on these two occasions and that she received bruises and after she fell she was given Motrin. Appellant
comforted the victim after her falls. Appellant also contends there is a possibility that the victim's mother
could have shaken her before the mother and Melissa left the apartment on the night the victim was found
in her bed not breathing. Although there is some conflicting evidence, the evidence shows the victim was
eating and playing in a normal manner after she fell down the stairs. The expert witnesses rejected the
possibility that the falls down the stairs resulted in or contributed to the victim's death.

 A white baby sock, a pale yellow sock, a blue bed sheet, and a white sheet were
"collected" at the apartment. The officer who discovered the white sock testified, "I picked it up, it had
what appeared to be very fresh -- no better term than--vomit" on it. The socks were found "up
underneath the head of the bed." These physical objects were not tested in a laboratory and appellant
argues that there was no link to the victim or appellant.

 Dr. Guileyardo testified at length rejecting the contention that the victim's fall down the
stairs caused her death. Dr. Guileyardo testified:


The blunt force injury certainly was plenty enough to cause the death. The retinal
hemorrhages could have resulted from some shaking, but like I said, people disagree about
that shaking business. But there's no question about the blunt force part of the head
injuries.


* * * * *



[W]hen I say blunt force I'm, I'm ruling out something sharp with an edge to it. So, we've
got something blunt, either something blunt struck the child's head or the child's head was
made to strike something blunt. It did not have something that would cut the skin.


Q: Okay. Could a hand or fist be such of a blunt object to be able to cause the type
of injuries that were caused to Destiny Adkins?


A: Yes.


Q: Could, in fact, throwing or shoving Destiny Adkins' head against either a floor, a
wall, a mattress, cause the type of injuries that you saw on the head of Destiny
Adkins?


A: Yes.


* * * * *



Q: The kind of injuries that you saw that led to the cause of death or Destiny Adkins
could by use -- could have occurred by someone using their fist or their hand; is that
correct?


A: That's correct.


Q: By shoving or throwing Destiny Adkins against an object?


A: Yes.


* * * * *



A: Yes. I think you could grab the head tightly with the fingers, that could cause some
of the bruises, slam the head up and down against the mattress, and you could get
this sort of a whipping back and forth of the brain inside the skull and damage the
structures of the brain. And I think you could cause a subdural hematoma, too,
acting like that.


* * * * *



Q: Now, as to what happens when a child receives these type of injuries that you saw
in Destiny Adkins, what takes place after the injury has been received?


A: Once you receive this kind of massive force into the brain then the internal parts of
the brain are damaged so that the brain stops functioning the way it normally would.


Q: And how, what symptoms would then show themselves in connection with this type
of injury?


A: The child would lose consciousness and would stop breathing.


Q: How immediate would these types, would this, would this occur from when this type
of injury occurred to Destiny Adkins?


A: With this kind of force it would be very rapid. It would be within a few minutes.


Q: Is this the type of injury once received that a person, well, that Destiny Adkins would
have had the ability to walk, play, eat, go to the bathroom, after they received it?


A: No.


* * * * *



 There are cases where people talk about an interval after an injury where there's a
delay. Those are cases where blood accumulates and forms a subdural that builds
up over a period of time. There may be some healing along with that. Of those
cases in which the brain continues to swell and herniates out through the skull itself,
and that's not what we have here. This is an acute injury. We have an acute
subdural. It's not a big subdural that's occupying a lot of space. So, she died of the
actual blunt force to her brain which damages the internal parts of the brain. The
subdural accumulated and the brain did swell, but she would have had these loss of
function from the time she had the blunt force blows.


Q: Would, would a child immediately after having suffered an injury like this begin to not
be able to breathe?


A: Within a very few minutes she would lose function, yes.


Q: Would a child after receiving an injury like this begin -- would it be unusual to find
that it had thrown up or vomited?


A: It's very common, yes.


Q: Now, were you aware also, did you become aware of the fact that there had been
a history of two falls down stairs that this child had experienced?


A: Yes.


Q: Okay. And the history concerning these falls, did you look at that as being a
potential accidental explanation of the cause of Destiny Adkins death?


A: Yes, I considered that.


Q: And what did you determine?


A: I determined that she was playing and was active after both of those falls and that
there's no way that this could have happened when she fell on the stairs, and she
would have waited that length of time playing and looking normal, and then all of a
sudden getting this. So, this is a separate set of injuries in my opinion from the falls
on the stairs.


* * * * *



A: From looking at the blood clot itself there was no reaction to it under the
microscope, no tissue reaction. As soon as you get the blood clot the body starts
trying to wall that thing off, and so we looked for changes like that. There was no
reaction to it. So, there was no evidence that that blood clot had been there for two
days.


Q: A child with these type of injuries would not be capable of eating, would not be
capable of playing normally, walking, would have immediate obvious symptoms after
these injuries occurred.


A: Yes.


Q: Okay. Now, if you had found old head injuries, the iron stain testing that you -- that
you found there would be a greater likelihood to find a positive iron stain reaction;
is that correct?


A: Yes.


Q: You found none.


A: That's correct


Q: If it has been represented that there was a chronic or old blood clot to this jury that
was the cause of this child's death, is that correct?


A: No, it's not. Because the blood clot even at the autopsy was very thin and had not
really gotten big enough for it by itself to kill the child. Also, in the CT scan that was
done at the hospital, initially there was very little, there was even doubt whether or
not there was a subdural initially because it was so thin.


* * * * *



Q: Did you believe that this is the type of injury that could happen in an accidental way?


A: I did not believe this is an accidental injury. It's not a pattern of an accidental injury. 
And there is no explanation that has been offered that would explain these injuries.


* * * * *



A: Well, it's a massive force. It's not a trivial force. To me the best way to explain is
that kids fall down all the time all day long and they don't die. They don't come in
to us because they fell down. They fall down constantly and we see them fall down. 
Falling down and bumping your head does not cause you to die. It takes a massive
impact to the head to cause this kind of head injury. You can't put a number on it. 
You can't do research and drop kids, but it takes a lot of force.



 We have applied the standard of review required by Cain, Clewis, and Stone; after
examining all of the evidence impartially and giving deference to the jury's verdict, we conclude that the
jury's verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong or
unjust. We hold that the evidence is factually sufficient as well as legally sufficient to support the jury's
verdict and overrule appellant's first point of error.

 In his second point of error, appellant insists that the trial court erred in failing to charge the
jury on the lesser included offenses of manslaughter and aggravated assault and in failing to include an
application paragraph on the offense of injury to a child. The State argues that appellant waived appellate
review of these matters in the trial court, because appellant neither objected to the charge given nor
requested that the lesser included offense charges be given. Preserving matters for appellate review relating
to the jury charge requires timely objections or a request for the charge desired. See Tex. R. App. P. 33.1;
Vasquez v. State, 919 S.W.2d 433, 435 (Tex. Crim. App. 1996); Manry v. State, 621 S.W.2d 619, 623
(Tex. Crim. App. 1981); Boles v. State, 598 S.W.2d 274, 278 (Tex. Crim. App. 1980); Ashworth v.
State, 418 S.W.2d 668, 670 (Tex. Crim. App. 1967). Appellant did not object to the court's charge and
did not request the inclusion of the lesser included offense charges. Moreover, before the court's charge
was submitted there was the following colloquy: 


THE COURT: Okay. We are outside the presence of the jury for the purpose of taking
up the proposed Court's charge. I believe each side has now had the opportunity to
review it, which is pretty well self-explanatory.


I'll start with you, Mr. [Defense Counsel]: Do you have any objections, additional
submissions, requests that you wish to make concerning the proposed Charge?


[Defense Counsel]: The only part, your Honor, is the page about -- I don't know if you
have it in your proposed Charge -- about the Defendant not testifying.


[Prosecutor]: That's out.


THE COURT: No, I don't have that.


[DEFENSE COUNSEL]: Other than that we have none.



 This was tantamount to affirmative approval of the charge the court submitted to the jury
and appellant cannot now complain. See Reyes v. State, 934 S.W.2d 819, 820 (Tex. App.--Houston
[1st Dist.] 1996, pet. ref'd); Lopez v. State, 860 S.W.2d 938, 940 (Tex. App.--San Antonio 1993, no
pet.). We overrule appellant's second point of error.

 In his third point of error, appellant urges that he was denied the effective assistance of
counsel afforded by the United States Constitution. See U.S. Const. amend. VI. To show ineffective
assistance of counsel, appellant must show that: (1) trial counsel's performance was deficient, in that
counsel made such serious errors that he was not functioning effectively as counsel; and (2) the deficient
performance prejudiced the defense to such a degree that appellant was deprived of a fair trial. Strickland
v. Washington, 466 U.S. 668, 687 (1984); Hernandez v. State, 726 S.W.2d 53, 57 (Tex. Crim. App.
1986); Shaw v. State, 874 S.W.2d 115, 118 (Tex. App.--Austin 1994, pet. ref'd); O'Hara v. State,
837 S.W.2d 139, 143 (Tex. App.--Austin 1992, pet. ref'd). Counsel's performance is to be judged by
the "totality of representation" provided. Strickland, 466 U.S. at 690; Butler v. State, 716 S.W.2d 48,
54 (Tex. Crim. App. 1986). In deciding an ineffective-assistance claim, this Court must judge the
reasonableness of counsel's challenged conduct on the facts of the particular case, viewed at the time of
counsel's conduct--not by hindsight. We must then determine, in light of all the circumstances, whether
the acts or omissions are outside the wide range of professionally competent assistance. Strickland, 466
U.S. at 690. Appellant bears a heavy burden to prove his ineffective assistance claim. Counsel is strongly
presumed to have provided adequate assistance and to have made all significant decisions in the exercise
of reasonable professional judgment. Id. We must not look at the errors of counsel in a vacuum. As a
general rule, isolated instances in the record reflecting errors of omission or commission do not necessarily
render counsel's representation ineffective. McFarland v. State, 845 S.W.2d 824, 843 (Tex. Crim. App.
1992); Ex parte Owens, 860 S.W.2d 727, 729 (Tex. App.--Austin 1993, pet. ref'd).

 Appellant complains that his trial counsel were ineffective because they (1) did not ask "for
a charge on the lesser included offenses of aggravated assault and manslaughter and by allowing the charge
to go to the jury without an application paragraph for the lesser included offense of injury to a child," (2)
failed to obtain a hearing on a motion to examine physical evidence, and (3) did not stop "the prosecutor
in his constant objectionable behavior."

 We first must determine whether, if timely and properly requested, it would have been error
for the trial court to have refused to submit to the jury charges on aggravated assault, manslaughter, and
injury to a child.


In Rousseau, 855 S.W.2d at 673, we established a two-prong test to determine whether
a defendant is entitled to a charge on a lesser included offense. We held:


 [F]irst, the lesser included offense must be included within the proof necessary to
establish the offense charged, and, second, some evidence must exist in the record
that would permit a jury rationally to find that if the defendant is guilty, he is
guilty only of the lesser offense.


[Emphasis in original.] It is not enough that the jury may disbelieve crucial evidence
pertaining to the greater offense. Rather, there must be some evidence directly germane
to a lesser included offense for the factfinder to consider before an instruction on a lesser-included offense is warranted. Bignall v. State, 887 S.W.2d 21, 24 (Tex. Crim. App.
1994).



Cantu v. State, 939 S.W.2d 627, 646 (Tex. Crim. App. 1997) (quoting Rousseau v. State, 855 S.W.2d
666, 673 (Tex. Crim. App. 1993)); Navarro v. State, 863 S.W.2d 191, 203 (Tex. App.--Austin 1993),
pet. ref'd, 891 S.W.2d 648 (Tex. Crim. App. 1995).

 Appellant testified that he did not kill or injure the victim and he did not know how the
victim received the injury that caused her death. There is no evidence from other sources to support the
submission of charges on the lesser-included offenses of aggravated assault, manslaughter or injury to a
child. There is no evidence in the record that would have permitted the jury to find rationally that appellant,
if guilty, was guilty only of the lesser included offenses. Moreover, even if trial counsel had believed
appellant was entitled to the lesser included offense charges, counsel may not have requested them as a
matter of strategy. In view of the evidence, trial counsel may have thought it better strategy to require the
jury to either find appellant guilty of capital murder or to acquit appellant and not be able to compromise
by finding him guilty of a lesser included offense. Trial counsel's strategy is not to be judged by hindsight.

 The trial court without request or objection charged the jury on the lesser included offense
of murder. In so doing the trial court charged the jury:


A person commits the offense of Capital Murder if he commits Murder, as defined below
in (a), and the person murders an individual under six years of age.


A person commits the offense of Murder:


 (a) if he intentionally or knowingly causes the death of an individual; or

 (b) if he intentionally, knowingly, or recklessly commits or attempts to commit a
felony, to-wit: Injury to a Child, and in the course of and in furtherance of the
commission or attempt, he commits or attempts to commit an act clearly
dangerous to human life that causes the death of an individual.


A person commits the offense of Injury to a Child if he intentionally, knowingly, or
recklessly by act causes to a child serious bodily injury or bodily injury.



The trial court did not give a lesser included offense charge on the offense of injury to a child. The court
gave the abstract definition of injury to a child as an integral part of the lesser included offense charge on
murder. The court included an application paragraph on the offense of murder. Appellant's complaint that
the trial court did not include an application paragraph on the offense of injury to a child is without merit.

 Appellant faults trial counsel for failing to obtain a hearing on a motion to examine physical
evidence. He argues that the sock found under the bed could have been analyzed to determine whether
or not it "tested positive for the child's vomitus." The record is clear that no laboratory test of the sock had
been made. In another point of error appellant argues that "these physical objects [including the sock]
were not tested, and there was no link to the deceased or the appellant." The record shows that the State
followed an "open file" policy allowing defense counsel's inspection of the State's file. Therefore, appellant
knew before trial about the State's evidence concerning the sock. If it may be argued that trial counsel's
performance in not obtaining a hearing was deficient, appellant did not demonstrate, on a motion for new
trial or otherwise, that a laboratory analysis of the sock would have benefitted appellant's defense or that
he was deprived of a fair trial. Appellant's third point of error is overruled.

 In his fourth point of error, appellant contends that he was denied a fair trial because of
prosecutorial misconduct. In argument in his brief, appellant makes general statements such as appellant's
"unfair trial [was] due to the prosecutor's outlandish behavior" and "the synergistic effect of the many errors
of prosecutorial misconduct at trial were highly prejudicial and prevented the appellant from receiving a fair
and impartial trial." Appellant cites many cases that state proper rules of law but they apply to facts and
circumstances unlike those in the present case. The main cases appellant cites are Stahl v. State, 749
S.W.2d 826, 830 (Tex. Crim. App. 1988); Koller v. State, 518 S.W.2d 373, 378 (Tex. Crim. App.
1975); Boyde v. State, 513 S.W.2d 588 (Tex. Crim. App. 1974).

 In Stahl, the mother of the victim when testifying before the jury was shown a "morgue
photograph" of her son that resulted in her sobbing and shouting. The Court of Criminal Appeals held that
the prosecutor had failed to take steps to prevent such a predictable outburst. The appellate court stated
that thereafter the prosecutor sought to exacerbate the impact of the mother's outburst in his jury argument. 
The Stahl prosecutor's acts and argument were all done over defense objections and the trial court's
admonishments. There is nothing comparable in the record in this case. In Koller, the errors were
preserved for appellate review; the prosecutor's argument constituted a comment on the defendant's failure
to testify, and after the trial court sustained a defense objection, the prosecutor persisted by again
interrogating a witness to show that the woman who had accompanied the defendant to the courthouse
when he made a confession, was a prostitute. There is nothing comparable in this record. In Boyde, the
prosecutor made numerous attempts to circumvent the trial court's rulings both in presenting evidence and
in jury argument. There is nothing comparable in this record.

 Appellant contents himself with merely making page references and in mischaracterizing
the record. For example, appellant writes:


 Rarely has this Honorable Court seen such chronic and continuous examples of
prosecutorial misconduct calculated to prejudice the jury as is evident from the record in
this case. The prosecutor constantly referred to specific facts of the trial of this case in his
voir dire (RR VI, p's 25-27). This is done in an obvious attempt to get the panel members
to commit to the State's version of the facts of the case before any evidence is admitted
(Id). Further, the prosecutor continually tried to get panel members to commit to the truth
of its medical testimony by referring to the specific evidence he hoped to admit in this
particular case (RR VI, p. 52). The prosecutor also used hypotheticals improperly with
the intent to prejudice the jury (RR VI, p's 60-62). The prosecutor further prejudiced the
jury through misconduct by making a patently improper opening statement. The opening
statement makes no references to what the prosecutor expected the evidence to show;
rather, it is a blatant closing argument (RR VII, p's 14-15).



 Appellant refers to "RR VI, p. 25-27"; the record there shows the prosecutor telling the
jury venire that the State need not prove a defendant had a motive for committing the alleged crime. The
prosecutor then inquired whether any of the prospective jurors, in order to convict, would require the State
to show appellant had a motive. This was proper voir dire; defense counsel did not object and such an
objection would have been properly overruled by the trial court. Appellant refers to "RR VI, p. 52"; the
record there shows the prosecutor telling the venire that the State would present expert medical testimony
as circumstantial evidence to show the victim's cause of death. The prosecutor then inquired of the
prospective jurors whether they could consider medical testimony and circumstantial evidence. This was
proper voir dire; defense counsel did not object and any such objection would have been properly
overruled by the trial court. Appellant refers to "RR VI, p's 60-62"; the record there shows the prosecutor
asking the prospective jurors whether they could consider medical testimony in deciding if the cause of
death were accidental or nonaccidental. This appears to be proper voir dire. Appellant refers to "RR VII,
p's 14-15"; the record there shows the prosecutor making his opening statement to the jury. He told the
jury that the State expected to offer expert medical testimony to show that the victim's death did not result
from falling down a flight of stairs and that the experts would use terminology not heard by most people in
everyday conversation. The designated part of the prosecutor's opening statement does not appear to be
improper.

 In the same point of error, contending that they exemplify "abhorrent" "prosecutorial
misconduct," appellant points out three leading questions from this twelve-volume record. One question
was, "And while there I understand that the, that at that point after coming back the children were then fed? 
A. Yes." This question was asked by the prosecutor after the noon recess referring to the witness's
testimony given before the recess. This question used for transitional continuity cannot be properly branded
as "abhorrent prosecutorial misconduct." 

 More than thirty witnesses testified producing a voluminous record. The record shows a
hard fought case by both the defense and the prosecution with the trial court in complete control of the
proceedings. Appellant's allegations of prosecutorial misconduct are unfounded. Appellant's fourth point
of error is overruled.

 The judgment of the trial court is affirmed.



 

 Carl E. F. Dally, Justice

Before Justices Jones, B. A. Smith and Dally*

Affirmed

Filed: June 11, 1998

Do Not Publish



* Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. See Tex.
Gov't Code Ann. § 74.003(b) (West 1988).



 Court seen such chronic and continuous examples of
prosecutorial misconduct calculated to prejudice the jury as is evident from the record in
this case. The prosecutor constantly referred to specific facts of the trial of this case in his
voir dire (RR VI, p's 25-27). This is done in an obvious attempt to get the panel members
to commit to the State's version of the facts of the case before any evidence is admitted
(Id). Further, the prosecutor continually tried to get panel members to commit to the truth
of its medical testimony by referring to the specific evidence he hoped to admit in this
particular case (RR VI, p. 52). The prosecutor also used hypotheticals improperly with
the intent to prejudice the jury (RR VI, p's 60-62). The prosecutor further prejudiced the
jury through misconduct by making a patently improper opening statement. The opening
statement makes no references to what the prosecutor expected the evidence to show;
rather, it is a blatant closing argument (RR VII, p's 14-15).



 Appellant refers to "RR VI, p. 25-27"; the record there shows the prosecutor telling the
jury venire that the State need not prove a defendant had a motive for committing the alleged crime. The
prosecutor then inquired whether any of the prospective jurors, in order to convict, would require the State
to show appellant had a motive. This was proper voir dire; defense counsel did not object and such an
objection would have been properly overruled by the trial court. Appellant refers to "RR VI, p. 52"; the
record there shows the prosecutor telling the venire that the State would present expert medical testimony
as circumstantial evidence to show the victim's cause of death. The prosecutor then inquired of the
prospective jurors whether they could consider medical testimony and circumstantial evidence. This was
proper voir dire; defense counsel did not object and any such objection would have been properly
overruled by the trial court. Appellant refers to "RR VI, p's 60-62"; the record there shows the prosecutor
asking the prospective jurors whether they could consider medical testimony in deciding if the cause of
death were accident