IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-04-00244-CR

 

Rodger Kent,

                                                                      Appellant

 v.

 

The State of Texas,

                                                                      Appellee

 

 

 



From the 159th District Court

Angelina County, Texas

Trial Court No. 23791

 



MEMORANDUM  Opinion



 

          Appellant Rodger Kent was indicted on one count of aggravated sexual assault of a child on or about March
14, 2003.  A jury found Kent guilty, and he was sentenced to twenty years’
imprisonment.  In four issues, he complains of the sufficiency of the evidence,
the trial court’s refusal to grant a mistrial, and prosecutorial misconduct. 
We will affirm.

Sufficiency of the Evidence

          We will first address Kent’s third and fourth issues, which challenge the factual and legal sufficiency of the
evidence, respectively.

 

When reviewing a challenge to the legal
sufficiency of the evidence to establish the elements of the penal offense, we
must determine whether, after viewing all the evidence in the light most
favorable to the verdict, any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560
(1979).  The standard is the same for both direct and circumstantial evidence
cases.  Kutzner v. State, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).

We do not resolve any conflict of fact or assign
credibility to the witnesses, as this was the function of the trier of fact.  See
Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999); Adelman v.
State, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992); Matson v. State,
819 S.W.2d 839, 843 (Tex. Crim. App. 1991).  Instead, our duty is to determine
if the findings of the trier of fact are rational by viewing all of the
evidence admitted at trial in the light most favorable to the verdict.  Adelman,
828 S.W.2d at 422.  In so doing, any inconsistencies in the evidence are
resolved in favor of the verdict.  Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); Matson, 819 S.W.2d at 843.

In a factual-sufficiency review, we view all of the evidence in
a neutral light and consider only whether a jury was rationally justified in
finding guilt beyond a reasonable doubt.  Zuniga v. State, 144 S.W.3d
477, 484 (Tex. Crim. App. 2004).  However, there are two ways in which the evidence
may be insufficient.  Id.  First, when considered by itself, evidence
supporting the verdict may be too weak to support the finding of guilt beyond a
reasonable doubt.  Id.  Second, there may be both evidence supporting
the verdict and evidence contrary to the verdict.  Id.  Weighing all the
evidence under this balancing scale, the contrary evidence may be strong enough
that the beyond-a-reasonable-doubt standard could not have been met, so the
guilty verdict should not stand.  Id. at 485.  This standard
acknowledges that evidence of guilt can preponderate in favor of conviction but
still be insufficient to prove the elements of the crime beyond a reasonable
doubt.  Id.  Stated another way, evidence supporting guilt can outweigh
the contrary proof and still be factually insufficient under the
beyond-a-reasonable-doubt standard.  Id.

Zuniga also reminds us that we must defer to the jury’s determination.  See
id. at 481. (citing Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim.
App. 1997)).  The jury determines the credibility of the witnesses and may
“believe all, some, or none of the testimony.”  Chambers v. State, 805
S.W.2d 459, 461 (Tex. Crim. App. 1991).  It is the jury that accepts or rejects
reasonably equal competing theories of a case.  Goodman v. State, 66
S.W.3d 283, 285 (Tex. Crim. App. 2001).  The evidence is not factually
insufficient merely because the factfinder resolved conflicting views of
evidence in favor of the State.  Cain, 958 S.W.2d at 410.

The Evidence

The victim in this case was H.E., a
thirteen-year-old girl at the time of the offense.  H.E. testified that she met
 Kent in January 2003, when she was thirteen and he was twenty-two.  H.E. said
that they were introduced by A.G., a mutual friend whom H.E. was dating at the
time.  H.E. testified that she told Kent that she was thirteen at that first
meeting.  Kent soon began showing a romantic interest in H.E., despite his
having a girlfriend (Ashley) with whom he lived and a two-year-old daughter.  According
to H.E., Kent began calling her, as she had given him her home phone number.

About a week later, A.G. told H.E. to sneak out of
her house and meet him and Kent.  H.E. complied and met Kent and A.G. at a
designated meeting spot, which was a tree away from H.E.’s house, which was in
a rural area.  Accompanying H.E. was her fourteen-year-old friend, B.D., who
was spending the night with H.E.  They all went to Kent’s apartment, where H.E.
said all they did was talk.

H.E. testified that Kent continued to ask her to
sneak out of her house at night, which she said she did a total of about ten
times.  Kent would call her and tell her what time to sneak out, and he would
pick her up outside her house by the tree.  According to H.E., Kent was calling her every night in this time frame.  Kent also picked her up at school one
time so they could spend the day together.  H.E. kept her relationship with Kent from her parents because she knew they would not let her date a man almost ten years
older.

H.E. testified that, on the night of January 31,
2003 at Kent’s apartment, she had sexual intercourse with Kent for the first time.  She said that she did not really want to have sex with him, but
he kept asking and she “did not want to seem like a little kid.”  H.E. also
said that to convince her to have sex with him, Kent told her that Ashley never
wanted to have sex with him.  H.E. testified that Kent left the apartment for
about ten minutes to go to the store to get a condom.  H.E. said that she noted
this event (the first time she had sex with Kent and lost her virginity) on a
calendar that she secretly kept as a diary.  The calendar was admitted into
evidence.  It noted other events relating to Kent, including the day (January
2, 2003) she “fell in love” with him and the day (January 6, 2003) she and B.D.
skipped school to be with him.  H.E. said that she wrote these entries on the
day or the very next day that the events happened.

Thereafter, Kent continued to have contact with
H.E. and “hung out” with her and her young teenage friends.  On one occasion, H.E.
and a friend, A.M., a twelve-year-old girl, met Kent and J.S., a
fifteen-year-old boy, at the mall, and H.E. and A.M. took Kent’s cap from him and wrote such things on it as “Rodger, you are sweet and fine” and “[H.E.]
and [A.M.] love you.”  A.M. kept the cap and took it home, but H.E. eventually
got it and gave it back to Kent.  Kent told H.E. that Ashley soon saw the
writing on the cap and got mad and thus found out about H.E.  The cap was
admitted into evidence.

H.E. and Kent had sexual intercourse two more
times.  The second time happened at Lake Ratcliff on the night of March 12,
2003, after Kent had picked up H.E. after she had snuck out of her house.  Kent drove H.E. and two teenage boys, A.G. and J.S., to the lake.  Kent let the boys drive his car around the lake, and while they were gone, Kent and H.E.
had sex on a picnic table at the lake, according to H.E.  This event was noted
on H.E.’s calendar.

H.E. testified that Kent never forced or
threatened her into having sex, that he always kept his shirt on, and that she
thus never saw any upper-body tattoos.  She testified that he had a tattoo on
his hand and one on one of his legs (somewhere on his leg or near his ankle),
but she could not remember either tattoo’s appearance.  H.E. described Kent’s bed as being two mattresses on the floor on top of each other.

The third sexual encounter—which served as the
basis for the aggravated sexual assault indictment—took place on the night of
March 14, 2003.  H.E. testified that Kent called her and told her that he had
intentionally started a fight with Ashley so that she would leave their
apartment and that Ashley had indeed left, taking their daughter with her.  On
this occasion, A.D., the twelve-year-old stepsister of H.E., snuck out with
H.E., and Kent picked them up and took them to his apartment.  J.S. was with Kent.  After the four of them watched television for a while, H.E. and Kent went to his
bedroom for about forty-five minutes, during which time they had sexual
intercourse, according to H.E.  A.D. and J.S. stayed in the living room,
watching television.  She documented this occasion on her calendar.

 H.E. testified that she did not want to have
sex with Kent but that she did because if she refused he would try to make her
feel “like a little kid.”  H.E. became angry with Kent when she learned that he
had not worn a condom.  She testified that, in response, Kent told her not to be mad because he liked her and that they would be together when she
turned eighteen.  H.E. said that Kent also told her not to tell anyone that
they were having sex because he would get in trouble because of her age.

Kent took
H.E. and A.D. home around 4:30 a.m., but they found that the bedroom window
that they had used to sneak out had been locked.  They knocked on the front
door, and H.E.’s brother let them in; their parents, who had locked the window,
had fallen back asleep.  H.E.’s brother had gotten a call that night from A.M.,
who told him that H.E. was sneaking out that night.  H.E.’s brother woke Candace
E., H.E.’s stepmother, and told her about the phone call and Candace and Don
E., H.E.’s father, discovered that H.E. and A.D. were missing.  Don thus locked
the window so they would have to use the door to get in.  Candace spoke with
H.E. in the morning, and H.E. told her that Kent had picked them up so that she
could see J.S.  H.E. testified that she told her stepmother that she snuck out
to see J.S. because he was much younger than Kent.  H.E. later told her father,
Don E., that they had snuck out just to go watch movies.

About a week later, H.E. wrote a letter to her
friend B.D.  The letter, which was admitted, recounted H.E.’s involvement with Kent, including that they had sex three times and her promise to Kent that she would date him in
four years.  H.E. said that B.D. gave the letter to her mother, who gave it to
H.E.’s grandmother, who in turn gave it to Don, who confronted H.E. about Kent and the contents of the letter.  H.E. spoke to Kent on the phone only one more time
after March 14, 2003, and in that call she said that Kent told her not to get
the police involved, and H.E. said that she agreed.  Don, however, did notify
the police.  H.E. gave the police a statement that she had sex with Kent three times.  And after H.E.’s father found her calendar, he gave it to the
prosecutor.

Don testified that initially H.E. was not
forthcoming about her involvement with Kent.    Don said that in the time frame
that H.E. was sneaking out, he never heard a car pull up in his driveway and
that his dog barked any time a car pulled up to his house.  He testified that the
day after H.E. was caught, she brought him the phone and Kent spoke to him, apologizing in general and saying that he did not know how old H.E. was
and crying that he wanted to be able to see his daughter grow up.  Kent did not specifically apologize for having sex with H.E., only for sneaking H.E. and
A.D. out of their house—at that time Don was not aware of sexual activity
between H.E. and Kent.

About a week letter, H.E.’s maternal grandmother
gave Don the letter from H.E. to B.D., and after reading it, he called the
sheriff’s department and made a complaint.  He also confronted H.E., who at
that time admitted to the contents of the letter but was still protective of Kent.  A few weeks before trial, Don testified that he found H.E.’s calendar under her bed
and gave it to the prosecutor.  He told H.E. that he had it, and she reacted
with embarrassment.  Don said that H.E. never had a chance to alter the
calendar after he found it.

J.S., who was sixteen at the time of trial,
testified that he had been friends with Kent since he was around fourteen in
March 2003.  He knew that Kent was twenty-two, and at that time they hung out
together just about every day, mostly riding around in Kent’s car.  J.S. knew H.E. at the time and that she was thirteen, but he volunteered that
she always lied about her age—when he first met her, she said that she was
fourteen.  J.S. knew Ashley and said that Kent and Ashley had a good, normal
relationship, but he later said that at times they were separated.

J.S. said that he was with Kent on three occasions that H.E. snuck out of her house.  They picked up H.E. near a tree down the
road from H.E.’s house; they never pulled into H.E.’s driveway.  At first J.S.
testified that he did not know if Kent knew how old H.E. was at the time, but
then he said that he and another boy “tried to tell him [Kent] one time what
her age was.”  “We told him.  We said, man, you’re too old to be messing with
these little 13-year-old girls.  And he didn’t really answer.”  J.S. admitted
telling the prosecutor in a phone call that Kent knew that H.E. was thirteen,
and he finally testified unequivocally that Kent knew that H.E. was thirteen.

J.S. testified about the night that H.E. snuck
out and they went to Lake Ratcliff.  He confirmed H.E.’s testimony that Kent
and H.E. got out of the car at the lake and that he and A.G. drove around the
lake in Kent’s car for thirty to forty-five minutes.  J.S. later asked Kent what he and H.E. had done, and Kent said that they just sat by the water.  J.S. said that one
time Kent admitted to having sex with H.E. at his apartment.  They also picked
up H.E. on another occasion and went to Lake Sam Rayburn.

On the March 14, 2003 occasion that H.E.
testified to, J.S. said that H.E. and her stepsister A.D. snuck out and they
all went to Kent’s apartment.  J.S. recalled Kent telling him that he and
Ashley had argued that night and that Ashley had gone to her mother’s house for
the night.  They sat around listening to music for about twenty minutes, and
then Kent went to the bedroom, with H.E. soon following him and shutting the
door.  They came out about forty-five minutes to an hour later.  It was this
occasion that Kent had admitted to J.S. of having had sex with H.E.  J.S. had
seen Kent’s bedroom, and like H.E., he testified that Kent’s bed was two mattresses on top of each other on the floor.

J.S. was interviewed by a deputy, and he
admitted that he and Kent had agreed in advance that they would say that the
girls were at Kent’s apartment for J.S., not for Kent.  J.S. admitted that he
lied to the deputy because Kent was his friend and he did not want Kent to go to prison.  J.S. also testified about the occasion when H.E. and A.M. took Kent’s cap from him at the mall and wrote on it, but he said that he got it back and gave it to Kent at the mall, but he later said that he could not remember if H.E. and A.M. took the
hat home.  J.S. said that Kent was upset that they had written on his hat
because Ashley would probably see it.

A.D., H.E.’s stepsister, testified that in
February and March 2003, she was twelve and that she snuck out two times with
H.E., whom she shared a bedroom with.  A.D. testified that H.E. and Kent would
speak on the phone late at night after their parents had gone to sleep and that
H.E. had a “big crush” on Kent.  The first time that A.D. snuck out with H.E. was
in February, and they were picked up by Kent at the tree down the road from the
house, and they went to his apartment and watched a movie.  The second time was
March 14, 2003, which A.D. remembered as being during spring break.  Kent and J.S. picked up A.D. and H.E. and took them to Kent’s apartment.  After talking and
listening to music in the living room, Kent and H.E. went to a back room for
about forty-five minutes with the door shut, while A.D. sat on the couch,
talking to J.S.  A.D. was worried about H.E. because she was gone for so long,
but she thought that she knew what was going on.  A.D. said that they were
taken home around 3:30 a.m. and found the window locked, but they found the
front door unlocked and went in, knowing they had been caught.  A.D. spoke with
her mother Candace the next morning but admitted only to sneaking out; she did
not reveal H.E.’s relationship with Kent.

Candace testified that she had been married to
H.E.’s father Don for seven years and that they never would have allowed H.E.
to date a man almost ten years older than she was.  She had never met Kent, and she had no idea that H.E. was sneaking out.  She never heard a car drive up to
their house late at night, and they had a dog that would have barked.

Candace said that on the night of March 14,
2003, her stepson woke her to tell her that A.M. had called and said that H.E.
had snuck out.  H.E.’s bedroom door was locked, so Candace and her stepson went
outside and she put him through the window, and they found that H.E. and A.D.
were gone.  Candace testified that she heard them come in the back door around
4:00 or 4:30 a.m., that she got up and told the girls to go to bed and that she
would talk to them in the morning.  When Candace spoke to A.D. and H.E., she
got very little information, especially from H.E., who later claimed to be in
love with Kent and very protective of him.  Over time Candace got bits and
pieces of the story from A.D. and H.E.  Ashley called Candace on the phone one
time soon after the March 14, 2003 occasion.  Ashley was upset, and Candace got
the impression that Ashley knew what had gone on between H.E. and Kent.

Detective John Davis of the Lufkin Police
Department was the State’s last witness.  He interviewed Don and H.E. together
about two weeks after March 14, 2003, and Don gave Davis a copy of H.E.’s
letter to B.D.  Davis said that H.E. was initially reluctant to talk about Kent and protective of him.  H.E. never denied having had a sexual relationship with Kent to Davis, and she eventually admitted to having sex with Kent.  After learning about the
writing on Kent’s hat, Davis obtained a search warrant and got the hat from
Kent, who initially agreed to a police interview but later declined.  On April
9, 2003, Davis arrested Kent for the offense of aggravated sexual assault of a
child under the age of fourteen.  No sexual assault exam of H.E. was requested
or done because of the two-week period of time that had passed; only H.E.’s
written statement was obtained.  Davis admitted that in hindsight he should
have requested an exam and the results might have been of some benefit.

Ashley was the first defense witness.  She said
that she was Kent’s girlfriend, that they had been together for four years, and
that they had a daughter.  Ashley testified that she and Kent were living
together in December 2002 and January 2003, but they separated for about two
weeks in January 2003.  Ashley admitted that on March 14, 2003, she and Kent
had an argument and she and her daughter went to her mother’s house to spend
the night.  She also admitted to finding Kent’s hat and fighting with him over
what had been written on it.

Ashley worked at Kmart, and while she was at work,
Kent, her sister, or her mother cared for their daughter.  Ashley testified
that she did not think that it was possible that Kent was with H.E. nine times
because if Ashley was at work, Kent would have been caring for their daughter. 
But, she admitted that Kent took their daughter to her mother’s house on
occasion and that she did not know what Kent was doing when she was at work or when
she spent the night at her mother’s house.  She said that Kent never got up and left in the middle of the night and that his car had a very loud
muffler that could be heard a block away.  Ashley admitted that Kent thought of himself as a teenager and that he hung out with younger teenagers because when he
moved to Lufkin from Oklahoma at age nineteen, his first friend Josh was
friends with J.S. and A.G., who were younger but accepted Kent.

Ashley testified that in 2003, she and Kent were
having a regular sexual relationship, that he never said he was dissatisfied
sexually, and that he didn’t need to go out and seek sex from someone else.  She
never worried that Kent was cheating on her.  Ashley described Kent as shy about his body and said that he rarely took his shirt off in front of others. 
She described his extensive tattoos on his shoulder, arms, chest, and legs.  She
said that she can see the tattoos on his thighs when having sex with him. 
Ashley also said that the bed in the apartment had a frame and that the
mattresses were not on the floor.

Ashley testified that Kent told her that on the
night of March 14, 2003, he drove up to H.E.’s house and the two girls got in
his car and they went to the apartment and watched a movie and listened to
music.  Ashley testified that the next day, a man whom she assumed was H.E.’s
father called her at work, telling her that H.E. and A.D. had been at her
apartment the night before and giving Ashley the girls’ mother’s phone number. 
She admitted to calling Candace and being upset about the allegation that young
girls were at her apartment with Kent.  Also, she said that a sheriff called
her that day and asked for Kent to come in and give a statement.  She, Kent, and J.S. all went to the sheriff’s department that day.  She also heard Kent call H.E.’s father and apologize for sneaking the girls out.

Kent
testified in the guilt-innocence phase.  He said that he met H.E. twice—first
at the mall and second on the night of March 14, 2003, when he picked up the
girls.  On the occasion at the mall, Kent said that he was at the arcade and
J.S. introduced H.E. and another girl to him.  He said that the girls took his
hat at this first meeting and wrote on it.

On the March 14, 2003 occasion, Kent said that J.S. was staying with him and that J.S. set it up for them to pick up H.E.
and her stepsister.  He said he pulled up to her house and picked them up at
the end of the driveway around 11:00 p.m.  He described his car as having a
very loud muffler that can be heard three blocks away.  They then went to his
apartment, watched a movie, and listened to music.  Kent said that he took the
girls home around 2:30 or 3:00 a.m.

The next day, Kent went to Kmart and learned
from Ashley that A.D.’s father had called her and told her that Kent had brought the girls to his apartment.  He then told Ashley what had happened—picking
up the girls, watching a movie, and listening to music—and on his way home, he
stopped at a pay phone and called Don to apologize for picking up the girls. 
He said that he told Don that he thought the girls were sixteen and that he
would never pick them up again.  He admitted that he was crying in this phone
call, but he denied saying that he did not want to go to jail.

Kent testified that
Ashley also told him that Officer Torres from the sheriff’s department had
called and wanted a statement from Kent and J.S.  Kent said that he gave a
statement that they watched a movie and listened to music, and J.S. said H.E.
was his girlfriend—at that time there were no allegations of sexual activity
between Kent and H.E.

Kent, like
Ashley, testified that his bed was on a frame, not on the floor, and he
likewise described all his tattoos.  He denied ever having sexual intercourse
with H.E.

Kent said
that he had no idea why H.E. was writing things about him on her calendar,
especially about the day she skipped school to be with him, which he said was in
a time frame when he had not even met her.  Kent said that J.S. was lying when
J.S. testified about Kent knowing that H.E. was thirteen.  Kent testified that both H.E. and J.S. told him that H.E. was sixteen.  Kent’s theory was that J.S. was lying because H.E. had been J.S.’s girlfriend at one time
and H.E. talked J.S. into lying.  Kent said that H.E., A.D., and J.S. all were collaborating
against him because he had refused to hold H.E.’s hand at his apartment and
that he earlier rejected her flirting at the mall.  As for H.E.’s letter to
B.D., Kent theorized that, despite her statement in it that she was trying to
get Kent out of trouble, she was trying to make herself look innocent.  He
could not explain why H.E. stated in the letter that she was trying to protect
him while also admitting that she had sex with him three times.  And if H.E.
was trying to set him up, Kent could not explain H.E.’s silence about sex for
two weeks after March 14, 2003, other than that was just the way H.E. planned
it.

Kent, who had since moved back to Oklahoma by the time of trial, admitted that he hung out with teenagers in Lufkin and that
he had recently been arrested with a sixteen-year-old boy in Oklahoma on a
marijuana possession charge. 

On cross-examination Kent denied going to a
Sonic Drive-In and flirting with a fifteen or sixteen-year-old girl who worked
there.  He admitted that he went to Sonic and talked with a young woman who
worked there named Sarah who would give him free drinks, but he said she was
eighteen at the time.  Kent said that Ashley even went with him a couple of
times and got free drinks from Sarah, but Ashley contradicted Kent, denying that she ever went to Sonic with him and got free drinks.

In rebuttal, H.E. said that she had dated J.S.
for two weeks in late April 2003, but she had not seen or spoken to him since
May 2003, more than a year ago as of the time of trial.  H.E. denied meeting or
speaking with J.S. to go over their testimony.  H.E. also said that Kent and J.S. told her that Kent was seeing a sixteen-year-old girl who worked at Sonic.

Analysis

Plainly, the jury believed the State’s case and
witnesses and did not believe the defense. H.E. testified she had sexual
intercourse with Kent three times, including the indicted occasion on March 14,
2003, and her calendar and her letter to B.D. corroborated her testimony.  She
never denied having sexual intercourse with Kent.  J.S. testified that Kent admitted to him that he had sexual intercourse with H.E. on the night of March 14, 2003, and
J.S. said that Kent knew that H.E. was thirteen because J.S. had told him so. 
J.S. was present at Kent’s apartment on the night of March 14, 2003, and he
stated that Kent and H.E. went into Kent’s bedroom for thirty to forty-five
minutes.  A.D. was also there and gave testimony almost identical to that of
J.S.  Ashley admitted that she was not there that night because she and Kent
had argued.  This testimony corroborated that of H.E. and J.S., and the
calendar, the letter to B.D., and H.E.’s “love notes” on Kent’s cap all further corroborated the State’s case.

Considering all of the evidence in the light
most favorable to the verdict, the jury could rationally have found beyond a
reasonable doubt that Kent committed the offense of aggravated sexual assault
of H.E., a child under the age of fourteen.  Jackson, 443 U.S. at 318-319, 99 S.Ct. at 2788-89.  Finding the evidence to be legally sufficient, we
overrule Kent’s fourth issue. 

Considering all of the evidence in a neutral
light, we cannot say that the jury was not rationally justified in finding Kent guilty.  Zuniga, 144 S.W.3d at 484.  The evidence supporting the finding of
guilt, considered alone, was not too weak to support the finding beyond a
reasonable doubt, and the contrary evidence was not so strong that guilt could
not be proved beyond a reasonable doubt.  See id. at 484-85.  We must
defer to the jury’s determination of the credibility of the witnesses, and we
may not ignore evidence that supports the jury’s verdict.  Johnson, 23
S.W.3d at 7; Cain, 958 S.W.2d at 407.  The evidence was factually
sufficient, and we overrule Kent’s third issue.

Mistrial and Prosecutorial Misconduct

          In his first issue, Kent complains of testimony elicited by the State from J.S. about a nickname that J.S. and others
had for Kent and the trial court’s refusal to grant a mistrial, and Kent’s second issue alleged prosecutorial misconduct in asking the nickname question.  The
testimony at issue was the following:

Q:      And at that point, did Rodger know how
old [H.E.] was?

A.      I don’t know.  I don’t know if he knew
her real age.  I think she lied to him, I don’t know.  I don’t know if he
really knew.  I think we tried to tell him one time what her age was.

Q.      Okay.  Do you remember you talked to me
on the phone a couple of times about this case; is that true?

A.      Yeah.

Q.      Okay.  Do you remember telling me that
he always knew that she was 13 years old?

A.      Yeah.

Q.      Okay.  And you told me that you talked
to Mr. Charanza [Kent’s trial attorney] over the lunch break?

A.      Yeah.

Q.      Okay.  And when you’re testifying here
today, it’s a little bit different from what you told me on the phone; is that
true?

A.      How?

Q.      Well, right now, sir, you’re saying that
you don’t know if he knew how old she was, but I talked to you on the phone
about three times.

A.      Yeah, he knew she was 13.

Q.      He knew she was 13?

A.      Yeah, because we tried to tell him.

Q.      Okay.  What did you tell him?

A.      We told him.  We said, man, you’re too
old to be messing with these little 13-year-old girls.  And he didn’t really
answer.

Q.      You, at 14, were telling him he was too
old to be messing with a 13-year-old girl?

A.      Yeah.

Q.      In fact, did you tell me that y’all had
a nickname for him?

A.      Yeah.

Q.      And what would you call him?

A.      We would call him Chester.

Q.      And what does that stand for?

A.      Chester the child molester. 

Q.      Did you ever call him that?

A.      Yeah.

Q.      Did other people call him that?

A.      Yeah, everybody did.  That’s why he got
mad.

                   [DEFENSE ATTORNEY]:  I
object, Your Honor.  May we approach?

                   THE COURT:         You may.

                   [DEFENSE ATTORNEY]:  This was
not given in any type of 404(b) extraneous offense, calling somebody a molester
- - Chester the molester, and I’m objecting to the testimony.  And I ask for a
mistrial.

                   [PROSECUTOR]:    An
extraneous offense is something he did.  He didn’t do that.  He’s saying what
he called him.  How is that an extraneous offense?

                   THE COURT:         I will
deny your motion.

 

          On appeal, Kent asserts that the State
improperly elicited character evidence in its case-in-chief, in violation of
Rule 404(a)(1) of the Texas Rules of Evidence, and that the trial court abused
its discretion by not granting a mistrial.

          Initially, we note that Kent’s complaint on appeal does not comport with the objection that he made in the trial
court, which is necessary for preservation of the complaint.  See Broxton v. State, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995)
(point of error must correspond to objection made at trial, and objection
stating one legal theory may not be used to support a different legal theory on
appeal).  For this reason, his
complaint has not been preserved for our review.  See Rezac v. State, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990).  Also,
later in the trial, on at least nine
occasions—four of which occurred in Kent’s testimony (including one time in
which he admitted that the boys did call him “Chester the molester”)—other
almost identical testimony was given without objection, including once in the
punishment phase in which Kent’s trial attorney even used the nickname while
questioning J.S.  Texas law
generally requires a party to continue objecting each time that allegedly
inadmissible evidence is offered.  See Ethington v. State, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991).  Any error in admitting
the evidence is cured where the same evidence comes in elsewhere without
objection.  See Etheridge v. State, 903 S.W.2d 1, 14 (Tex. Crim. App. 1994);
Rogers v. State, 853 S.W.2d 29, 35 (Tex. Crim. App. 1993) (error is
cured when defendant offers evidence identical to that which he earlier
objected to, unless brought in
later to meet, rebut, destroy, deny or explain improperly admitted evidence).  Because
 Kent did not preserve his complaint for appeal, we overrule his first issue.

          Kent’s second issue specifically
complains of prosecutorial misconduct for the prosecutor’s asking J.S. the
question about Kent’s nickname.  Prosecutorial misconduct is determined on a
case-by-case basis and exists where (1) the prosecutor deliberately violated an
express court order, (2) the misconduct was so blatant as to border on being
insubordinate, or (3) the prosecutor’s question was so clearly calculated to
inflame the mind of the jury that an instruction to disregard would not have
cured the harm.  See Stahl v. State, 749 S.W.2d 826, 831 (Tex. Crim.
App. 1988); Perkins v. State, 902 S.W.2d 88, 96 (Tex. App.—El Paso 1995,
pet. ref’d).

To preserve a complaint for appellate review, “the
traditional and preferred procedure for a party to voice its complaint has been
to seek them in sequence—that is, (1) to object when it is possible, (2) to
request an instruction to disregard if the prejudicial event has occurred, and
(3) to move for a mistrial if a party thinks an instruction to disregard was
not sufficient.  However, this sequence is not essential to preserve complaints
for appellate review.”  Young v. State, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004).  But “when a party's first action is to move for mistrial, . . . the
scope of appellate review is limited to the question whether the trial court
erred in not taking the most serious action of ending the trial.”  Id. at 70.  We review a trial court’s denial of a motion for mistrial for abuse of
discretion.  Ladd v. State, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).

Kent
concedes on appeal that his trial counsel did not request an instruction to
disregard.  It is further obvious that he did not specifically request a
mistrial based on prosecutorial misconduct; his objection was based on failure
to give notice of intent to offer extraneous offense evidence.  But because it
is apparent from the record that the trial court understood that Kent’s objection was directed at the prosecutor’s conduct in asking the nickname question,
his complaint is preserved.  See Dixon v. State, 928 S.W.2d 564, 564-65
(Tex. Crim. App. 1996).

Kent argues
that the question and answer were so obviously harmful and inflammatory that an
instruction to disregard would not have cured the harm and that a mistrial was
warranted.  See Young, 137 S.W.3d at 69-71; Stahl, 749
S.W.2d at 831; Huffman v. State, 746 S.W.2d 212, 218-19 (Tex. Crim. App.
1988); Els v. State, 525 S.W.2d 11, 14 (Tex. Crim. App. 1975).  The question
and answer at issue—Kent’s disparaging nickname, which purportedly reflected
his knowledge of H.E.’s age—occurred in the context of the State’s questioning of
J.S., who admitted that he did not want to be testifying against Kent and initially gave evasive answers on whether Kent knew H.E.’s age.  Additionally, as we note
above, at least nine other references to the nickname were subsequently made,
and no objections were lodged on those occasions.  In the context of this case,
the nickname simply does not rise to an incurably inflammatory level to amount
to prosecutorial misconduct and warrant a mistrial.  Kent’s second issue is
overruled.

Conclusion

          Having overruled all of Kent’s issues, we affirm the trial court’s judgment.

 

 

BILL VANCE

Justice

 

Before
Chief Justice Gray,

Justice Vance, and

Justice Reyna

          (Chief
Justice Gray concurs in the result.)

Affirmed

Opinion
delivered and filed June 29, 2005

Do
not publish

[CR25]